## VARY ET UX. *v.* PARKWOOD HOMES, INC.

[No. 105, October Term, 1951.]

*Decided March 7, 1952.*

*Motion for rehearing, filed March 8, 1952, denied April 1, 1952.*

The cause was argued before MARBURY, C. J., and DELAPLAINE, COLLINS, HENDERSON and MARKELL, JJ.

*William R. Richards* for appellants.

*Nicholas Orem, Jr.,* with whom were *Duckett, Gill & Orem* and *Stanley B. Frosh,* on the brief, for appellee.

COLLINS, J., delivered the opinion of the Court.

This is an appeal from a decree sustaining a demurrer to an amended bill of complaint praying specific performance of an alleged contract for the sale of real estate.

On June 25, 1951, Willard E. Vary, a veteran, and Carol M. Vary, his wife, filed a bill of complaint alleging in part that they had been disappointed by their inability to purchase a home in Kensington Estates, represented by one Floyd Abraham, for the reason that all of the houses had been sold. "The said agent, Floyd Abraham, told the plaintiffs that a new subdivision just like Kensington Estates was to be started in the very near future, that the houses in Parkwood would be the same, except for a $300.00 increase in price, as the houses in Kensington Estates, and would be built by the same company and financed by the same company that had handled all of the houses in Kensington Estates, that the said agent told the plaintiffs that the G.I. financing of the houses in Kensington Estates was under a 1st deed of trust held by Weaver Brothers, Inc., for 25 years, at 4% per year, monthly payments to be $74.00 and that $74.00 per month covered taxes, insurance, principal and interest, that during the period from February, 1950 to May 26th, 1950, the plaintiffs made several trips to Kensington, Maryland to see the said agent, Floyd Abraham concerning the progress of the new development known as Parkwood." They were later advised by this Floyd Abraham, then an agent for the defendant, appellee, Parkwood Homes, Inc., that houses were available for sale in the Parkwood development and they were invited to come there the next morning and sign a contract for the purchase of a home. Upon arrival there they were met by Mr. Abraham and shown sample houses. They selected a type "D" house to be built on Lot 6 Block 9, the first lot available in the subdivision.

"The said agent Floyd Abraham told the plaintiffs that they should sign a 'contract' at once and pay a $25.00 deposit, that the plaintiffs did on May 27, 1950, in the aforementioned sales office in Parkwood, sign a written contract with the defendant corporation which signed by its agent, Floyd Abraham, that that contract was filed with the original Bill of Complaint, marked Complainant's exhibit A." That Exhibit follows:

"WILLARD E. & CAROL M. VARY

TYPE D

Date: May 27, 1950

Lot 6 Block 9.

Address of Property:

Price: $11,250—(Fire Place).

Down Payment: 500.

Amount Due: $475

Monthly Payment (Due only at settlement): $73.50

Salary: $5400.00 yearly. (Mortgagor)...... (Mortgagor)......

It is understood by all principals that the above house will be held off the market for a period of until completed from the date of above contract agreement. At that time balance of deposit is to be paid to the Parkwood Homes, Inc. sales office and held in escrow pending approval of the purchaser.

It is further understood by the purchaser that the above deposit will apply to to the settlement fees and as such will not be returned to the purchaser, due to the fact that other purchasers with full intent of purchasing a home might be turned away, and due to the time consumed by the Parkwood Homes, Inc. personnel in servicing.

In the event that additional time is needed to complete the contracts, please call Oliver 3962

and explain the situation to the representative in the sales office.

Signed: WILLARD E. VARY
CAROL M. VARY

Address: 2107 Fort Davis St., S.E.
Wash., D. C.
Phone: AX: 6423

Deposit $25.00

By: FLOYD ABRAHAM,
Parkwood Homes, Inc."

That the financing of the house was agreed upon and "were to be as follows: a G.I. loan of $11250.00, to be secured by a 1st deed of trust, for 25 years, at 4% per year, monthly payments to be $74.00, and the G.I. loan was to be secured through Weaver Brothers, Inc., as per the newspaper advertisement marked Complainants exhibit 'B', that the plaintiffs expressly asked the said agent Floyd Abraham, whether any additional papers had to be signed or any additional acts to be done between that date and the day of settlement, and the said agent informed the plaintiffs that the contract just signed and marked Complainant's exhibit 'A', was the only contract to be signed by the parties and that no further acts were required prior to the actual settlement of the house which was not until completed, that the plaintiffs would be required to pay the rest of the $500.00 down to cover settlement fees at the time of settlement, that the plaintiffs would be notified in time to make their selections as to wall-paper and bathroom tile colors, that the house built on Lot 6 Block 9 would be identical with the sample house type 'D', that that is the reason for type 'D' being printed on the top of the contract signed that day and marked Complainant's exhibit 'A'."

That on August 5, 1950, they were called to come out to Parkwood and sign a new contract for the purchase of the house originally purchased on May 27, 1950. On August 5, 1950, the plaintiffs went to Parkwood,

and Weaver Brothers, Inc., insisted that the $475.00 due at the time of settlement under the May 27th contract be paid immediately, "that the plaintiffs paid to Weaver Brothers, Inc., the sum of $475.00, that this new contract contained an 'escalator clause' calling for the buyer to pay any and all increases of the property as set by the defendant corporation without any notice whatsoever to the plaintiffs, that the plaintiffs signed this new contract only after insisting that the escalator clause be removed, that it was removed, but that the contract was returned to the plaintiffs with their signatures torn off and the plaintiffs were informed by Weaver Brothers, Inc., that the defendant corporation would not accept the new contract without the 'escalator clause', that the first new contract filed herewith and marked Complainant's exhibit 'F', described the house on Lot 6 Block 9 as being a type 'D' as registered with the VA and gave its address as that of the original sample house at 10402 Summit Ave., that the second new contract filed herewith and marked Complainant's exhibit 'G', contained the same broad escalator clause, and did not describe the plaintiffs house as being the same as the sample house type 'D' at 10402 Summit Ave., but merely as the new type 'D' that the defendant corporation had just recently filed with the VA the said new type 'D' does not show a stone front as did the house that the plaintiffs contracted to purchase."

That the house now on Lot 6 Block 9 which the "plaintiffs contracted to purchase, under a G.I. contract as per the original agreement dated May 27th, 1950, is not identical with the sample house at 10402 Summit Ave., a type 'D' house." The bill of complaint then points out the difference between the type "D" house specified in their alleged contract of May 27, 1950, and the house at 10402 Summit Ave.

"That the plaintiffs do not feel that in good equity or conscience they ought to be made to bear the burden of any increased costs in the construction of their house since last May 27th, where such increases are caused by

external forces entirely beyond any control by the plaintiffs, that the defendant corporation is merely using the fortuitous outbreak of hostilities in Korea to seek a better 'deal' on its properties because it knows that it is in a seller's market and that many families are today in desperate need of proper and adequate housing just as are the plaintiffs, and the defendant corporation is using the outbreak of hostilities in Korea as an excuse to 'charge the Veteran whatever the traffic will bear', without any regard to contracts or contractual obligations imposed upon it signs these contracts with Veterans and their families and accepts the Veteran's 'hard-earned money' as a deposit on a house to be built on the lot of his choice, that a decision in favor of the defendant corporation will virtually nullify the law of contracts as it is known in the State of Maryland today, that the G.I. Bill of Rights as enacted by the Congress of the United States, for the sole purpose of aiding Veterans like the plaintiffs will be virtually destroyed and Veterans throughout the state will be left to the mercy of 'sharp-dealing' builders who will be able to charge any price they so desire, no contractual liability to the contrary, that the plaintiffs sincerely hope that this Honorable Court will not take from them the benefits secured them by Federal Legislation and that this Honorable Court will not blind itself to the hardships that beset the average Veteran today in purchasing a home under the G.I. Bill of Rights, nor punish these plaintiffs for their meager knowledge of the law of contracts, but will on the contrary rigidly enforce the original agreement reached between the parties on the 27th day of May, 1950, as shown by complainant's exhibit 'A', this amended Bill of Complaint, plus the exhibits B through G, filed with this amended Bill of Complaint and made a part of same." By Exhibit "B" published in a Washington newspaper eight days after the writing here, Weaver Brothers advertised 2 Bedroom Houses for $11,250.

The bill asks for specific performance of the alleged agreement of May 27, 1950, or in lieu of specific performance, monetary damages, and for other and further relief. To that bill of complaint the appellee demurred and from a decree sustaining that demurrer and dismissing the amended bill, appellants appeal.

This paper dated May 27, 1950, is clearly not a contract of sale. It is merely an agreement to hold "off the market", for a consideration of $25.00, Lot 6 Block 9 until a house can be completed thereon. "At that time balance of deposit is to be paid to the Parkwood Homes, Inc., sales office to be held in escrow pending approval of the purchaser. * * * the above deposit will apply to the settlement fees." It also contains a memorandum of some of the elements necessary to a valid and enforceable contract such as price and the provision that the house is to contain a fireplace. There are, of course, many elements absent which are necessary to a valid and enforceable contract, such as the amount of cash payment on delivery of deed, amount of mortgage, and terms of mortgage. Of course, for the courts to specifically enforce a contract for the sale of land, such a contract to satisfy the Statute of Frauds, must, among other things, be in writing, and clear, unambiguous and certain and mutual and fair in all its parts so that the court can have no difficulty in knowing the terms of the contract to guide it in the directions to be given for specific performance. *Trotter v. Lewis,* 185 Md. 528, 532, 45 A. 2d 329, and cases there cited. *Smith v. Biddle,* 188 Md. 315, 52 A. 2d 473.

It was said in the case of *Trotter v. Lewis, supra,* 185 Md. at page 533, 45 A. 2d at page 332: "We specifically hold that a written contract of sale is conclusive as to the time, mode and terms of payment, and such provisions cannot be varied or contradicted by parol." See cases there cited. "It will not do to offer to do something outside the contract that is thought would make the contract certain, because that would be to import something into the contract, and would be to

change, alter, or vary the terms of the written contract." *Smith v. Biddle, supra,* 188 Md. 315, 321, 52 A. 2d at page 475. It was said in *Applestein v. Royal Realty Corporation,* 181 Md. 171, at page 174-175, about latent ambiguity: "In determining what is permitted to be explained and what is not, this court quoted with approval 3 *Jones on Evidence,* Section 455, to the effect that 'where any doubt arises as to the true sense and meaning of the words themselves, or any difficulty as to their application under the surrounding circumstances, the sense and meaning of the language may be investigated and ascertained by evidence dehors the instrument, for both reason and common sense agree that by no other means can the language of the instrument be made to speak the real mind of the party. In such a case parol evidence is admissible *ex necessitate.* * * * Oral testimony is offered to explain the words used in the contract, not to vary the contract nor to alter it in any way, *nor to add anything to it."* (Italcis supplied.) Here to prevail, appellant must rely on the written instrument of May 27, 1950, which is too indefinite to be specifically enforced. "A contract for the sale of land must be in writing, and signed by the party to be charged, or his authorized agent. Its terms must be clear, unambiguous and certain in all its parts, and fair and mutual. Specific performance is not a matter of right, but rests in the sound, equitable discretion of the chancellor. A contract for the sale of land, which on its face is uncertain, indefinite, vague and indistinct in a material matter, does not gratify the Statute of Frauds. It will not do to offer to do something outside the contract that is thought would make the contract certain, because that would be to import something into the contract, and would be to change, alter, or vary the terms of the written contract." *Smith v. Biddle, supra,* 188 Md. 315, 321, 52 A. 2d 475.

Also, this paper in its last paragraph refers to additional time needed "to complete the contracts". This contemplates the completion of a customary contract of

sale containing all the essential elements of a contract for the sale of real estate. In the case of *Kaufmann v. Adalman*, 186 Md. 639, 47 A. 2d 755, Max Lazarus & Sons were the owners of real estate. Kaufmann sought specific performance of a contemplated lease offered and approved by Lazarus. After citing the fourth section of the Statute of Frauds and other authorities, this Court said at page 649, which is applicable here: "It is contended that the acts of the appellees were fraudulent and that this unexecuted and incomplete lease should be enforced to prevent the perpetration of a fraud. We are of opinion that appellants were negotiating with Max Lazarus & Sons for a written lease of the property here concerned. We think the bill clearly shows this to be so. Neither party acquired any right against the other respecting the matter in hand during the negotiating, because it was their intention that no contract would result until the terms thereof were reduced to writing and signed by the parties. The appellants must have known this and if they assumed, under these circumstances, that negotiations amounted to a contract, when in point of fact and in law the negotiations did not amount to a contract, whatever they did, upon their mistaken assumption, and whatever loss resulted therefrom, cannot be attributable to Max Lazarus & Sons." The demurrer was properly sustained.

*Decree affrmed, with costs.*