GAYBIS, INDIVIDUALLY AND DOING BUSINESS AS GLOBE CONSTRUCTION COMPANY *v.* PALM ET UX.

[No. 35, October Term, 1952.]

*Decided December 3, 1952.*

80

The cause was argued before MARKELL, C. J., and DELAPLAINE, COLLINS, HENDERSON and HAMMOND, JJ.

*Arnold H. Ripperger,* for appellant.

*William J. Little,* with whom were *Baldwin, Jarman & Norris, Walter B. Siwinski* and *John R. Norris,* on the brief, for appellees.

DELAPLAINE, J., delivered the opinion of the Court.

Myer Gaybis, individually and doing business as Globe Construction Company, instituted this suit in the Circuit Court for Baltimore County to enforce a mechanic's lien against real property owned by William J. Palm, Sr., and his wife in Pikesville. He claimed a balance of $1,205.37 due under a contract to build their house at Oak and Glenback Roads. On February 18, 1852, the Court dismissed the bill, allowed the Palms a set-off of $1,685, and awarded a decree in favor of defendants against complainant for $479.63. Complainant appealed from that decree.

The record shows that the Palms on April 13, 1950, made an application to A. H. Carrigan & Company, realtors, to arrange for a contract with a builder for the construction of a house to be similar to the house at 515 Charles Street Avenue, near Towson, then occupied by Robert K. Musselman, a partner in the realty company, except that the house was not to have a basement. The cost was to be $14,950, the Palms to pay $5,000 in cash, and the balance to be procured by the company on a construction mortgage. Shortly afterwards the Palms decided that they wanted a basement, which would cost them $1,000 more. Accordingly on May 16 they signed a contract by which appellant agreed to build the house for them for $15,950.

The contract contained the following provision: "The General Conditions of the Contract, the Specifications and the Drawings, together with this Agreement, form the Contract, and they are as fully a part of the Contract

as if hereto attached or herein repeated. The following is an enumeration of the Specifications and Drawings: Drawings consisting of four (4) pages dated May, 1950. Specifications consisting of seven (7) pages."

Palm testified that he asked Musselman about the plans and specifications and was assured that "it was all right to sign the contract, because I was fully covered because my house would be built just like his, and I would have everything in that house that he had." About two weeks later Musselman brought him a copy of the plans, and explained that he had submitted a copy of the specifications to the Moss-Rouse Company, a mortgage dealer in Baltimore, along with the application for the construction loan, and that he would make another copy for him. About a week afterwards Musselman delivered a copy of the specifications.

On June 27 the Palms, upon acquiring title to their building lot, paid $5,950 to the realty company as the first payment on the contract. At that time they expressed no objection to the plans and specifications, which they had received several weeks before. The fact that the plans and specifications were not exhibited at the time of the execution of the contract did not render them nugatory. The Palms were given copies of them before any work was begun, and they gave their tacit approval of them. Where a contract by express terms makes plans and specifications a part of itself, they will control with the same force as though incorporated in the contract itself. *Aetna Indemnity Co. v. Waters,* 110 Md. 673, 73 A. 712.

The specifications in this case prescribed that the contractor would do all necessary normal excavating and rough grading; that all excess dirt would be hauled away by the contractor; and that all necessary fill would be provided by the owner. The specifications with which we are particularly concerned reads as follows: "If rocks, springs, wells, trees, or any unusual water conditions are encountered the owner will pay for same on

a time and materials basis over and above the contract price."

About July 1 appellant's foreman, Gino Geminanni, while staking off the lot, took several test borings and found water about two and a half feet below the surface. About July 15 appellant's workmen excavated with a bulldozer. Immediately there came a flow of water into the excavation. At times it was nearly one foot deep. Palm said that appellant offered to refill the excavation and provide for a utility room in place of a cellar at no extra cost. However, the fact remains that Palm watched the men at work, and was fully aware that they were not refilling the excavation, admittedly preferred to have a cellar, and acquiesced in the completion of the house with the cellar. Geminanni recommended that a sump pump be installed to drain the water into a ditch.

After Geminanni left the job, Raymond Pursley took charge as appellant's foreman. Palm testified that Pursley assured him that he knew how to build a house and to get a dry cellar. Palm bought two loads of cinders and a pump and drain tile. Appellant's workmen dumped the cinders and laid the tile, while an electrician employed by Palm installed the pump. It was found, however, that the pumping was not a complete remedy, because the flow of water continued.

In March, 1951, the appraiser for the Moss-Rouse Company, the agent for the mortgagee, inspected the property and found inadequate drainage for the foundation walls. On a visit to the property some time later, he found that the cellar was still wet, and for that reason his company declined to make further payment to appellant under the mortgage.

Some months later Palm called another contractor, Linwood Greenwalt, to inspect the cellar. Greenwalt noticed that water was seeping through the walls and floor. He testified that the joists were not filled with cement, and he undertook to make the cellar dry for $1,215. He cut through the cement floor, took out the drain tile, installed new tile, brought stone in and filled

it around the tile, and after refilling with cement applied hot asphalt, and put two inches of waterproof cement over the entire floor and waterproof cement and two coats of waterproofing on the walls.

The Maryland Mechanic's Lien Law provides that every building erected and every building repaired, rebuilt or improved to the extent of one-fourth its value shall be subject to a lien for the payment of all debts contracted for work done and materials furnished for or about the same. Code 1951, art. 63, sec. 1; *Welch v. Humphrey*, 200 Md. 410, 90 A. 2d 686. The statute provides that the proceedings to recover the amount of any mechanic's lien shall be by bill in equity and the same proceedings shall be had as used by the courts of equity to enforce other liens, and the court shall decree a sale and appoint a trustee to make sale thereof and shall apportion the proceeds of such sale among the persons entitled to liens according to their respective rights. Code 1951, art. 63, sec. 24. The purpose of the statute is to authorize the creation of a lien against property for work done and materials furnished, without the consent of the owner, but with notice to the owner or reputed owner. All proceedings for the enforcement of mechanics' liens are exclusively *in rem.* The subject-matter adjudicated in such proceedings is the lien in favor of the claimant upon a specific piece of property. *Shryock v. Hensel*, 95 Md. 614, 626, 53 A. 412; *Long Contracting Co. v. Albert*, 116 Md. 111, 81 A. 265; *Caltrider v. Isberg*, 148 Md. 657, 667, 130 A. 53.

The contract in this case does not contain a warranty that the cellar would be waterproof. On the contrary, the specifications provide that if any springs or unusual water conditions are encountered, the owners would pay for the same over and above the contract price. Appellant's workmen found that it was impossible to lay the foundation without keeping a pump in constant operation. The condition was described by Ray Shively, construction foreman, as follows: "There is no water visible coming to the surface, as it would be in a spring,

but yet there is a movement there—whether you call it a spring or mud hole, or what—that continually works, and it proved that by filling the pipes with mud. When I had my men in there pouring the cellar floor to try to overcome that, we dumped at least eight tons of stones in there."

It is our opinion that the contractor encountered an unusual water condition. When the construction work was nearing completion about March 1, one of appellant's workmen cut a four-inch hole through the wall with the hope of draining the water off. But that expedient also was ineffectual. "When he did that," Palm said, "water gushed in at a terrific rate, and it kept running, and in fact until this day it is still running."

The specifications required the basement foundation walls to be of an approved block. The appraiser for the Moss-Rouse Company admitted that the workmen did a "fair concrete block job." While it is true that the walls and floor of the cellar were not watertight, the evidence was not sufficiently definite to prove that the workmen failed to perform their work according to the specifications and that appellant was responsible for the damage that occurred under the unusual circumstances. Palm claimed that he fulfilled his contractual obligation to pay for the unusual water condition. Yet when the foreman told him that the necessary materials might cost $600, he refused to pay more than $170.62, and his cinders, pump and tile were inadequate. There seemed to be merit in the excuse which appellant gave on the witness stand: "The house was under construction to be built according to plans and specifications, and we wanted to give him exactly what he was paying for, and anything additional he should pay for. A contractor's job is not to keep putting more and more into a house. He doesn't bid it that way. He only bids on what he is contracting for. * * * We could have given him a dry cellar if he would have paid for the unusual conditions that prevailed. He refused to do the same."

Shively testified that he recommended that the level of the ground be raised in order to raise the foundation, but said that it would necessitate a quantity of fill dirt and appellant refused to pay for it. The difficulties under which appellant's men worked can be seen from Shively's testimony: "When we poured the cellar, I had my men in there and it was very muddy. It was still a certain amount of water, and one of my men had on hip boots and that man stepped in the hole and I know he went in there maybe three or four feet."

Appellant had the right to rely upon the specification that the Palms would pay for any unusual water condition. It is therefore our opinion that the Court below should not have allowed the set-off of $1,215 against appellant's claim. If a building contractor does his work in accordance with the plans and specifications and without negligence, he will not be liable to the owner where the building is subsequently damaged by reason of some defect in the building or some fault of the soil, in the absence of an express warranty that the plans and specifications are sufficient, inasmuch as he does not warrant their sufficiency but only the skill and care with which he performs his work and the soundness of the materials used therein.

Of course, a contractor is liable for breach of contract when he fails either to perform work which he undertook to do or to perform it with skill and care. The obligation to perform work with skill and care is implied by law and need not be stated in the contract. We accordingly hold that the Palms should be allowed a set-off of $445 for his failure to do certain painting, cementing and other work. Appellant made no objection in this Court to a set-off for that amount. We also think that a set-off of $25 should be allowed for appellant's failure to do certain work around the chimney, which was called for by the specifications.

As appellant's claim was for $1,205.37, and we have determined that the Palms should be allowed a set-off of only $470, we will reverse the decree of the Court

86

below and remand the case for the passage of a decree imposing a lien in favor of appellant for the sum of $735.37, with interest from February 18, 1952.

> *Decree reversed and case remanded for*
> *the passage of a decree in accordance*
> *with this opinion, with costs.*