EASTOVER STORES, INC. ET AL. *v.* MINNIX ET AL.

[No. 180, September Term, 1958.]

660

*Decided May 6, 1959.*

The cause was argued before BRUNE, C. J., and HENDER-
SON, HAMMOND and PRESCOTT, JJ.

*Robert B. Yorty,* with whom was *Raymond J. McDonough*
on the brief, for the appellants.

*Warren Browning* for the appellees.

PRESCOTT, J., delivered the opinion of the Court.

The defendant owner of a shopping center has appealed from a decree against him, which enforced a mechanics' lien filed by the plaintiff contractor. The chancellor summed up the facts as follows:

"This is a suit to enforce a mechanics' lien filed on February 26, 1958, by the plaintiffs, general contractors, against the defendant owners for labor and materials furnished in the erection of a shopping center addition located in Oxon Hill Election District. The plaintiffs' claim consists of the new contract price amounting to $1,055,591.68 plus various items claimed as extras, giving a total of $1,083,000.86, less payments of $902,029.96, leaving a balance of claim amounting to $180,970.90. In their answer, as amended, to the bill of complaint defendants have claimed set-offs by way of recoupment, totaling $161,090.69, and also ask that they be allowed to deduct $33,972.88, representing mechanics' liens filed by sub-contractors who supplied labor and materials to the plaintiffs on this project.

"The transcript of testimony contains 419 pages and approximately 100 exhibits presented by both sides. In deciding the case it therefore becomes necessary to summarize the facts as briefly as practicable, and take up separately the claims of the respective parties.

"Mr. A. Lloyd Goode has for many years been engaged in real estate development, particularly with reference to shopping centers. The defendants were organized in connection with developing what is generally known as the Eastover Shopping Center. In 1955 Mr. Goode completed the larger portion of the project on a portion of the property here involved, located on the Indian Head Highway, near the District Line. Being experienced in the building business he himself completed the first portion of the project and did not build it through a contractor. The original portion of the shopping center, as well as the addition, was constructed upon filled ground, and testimony shows that considerable difficulty was experienced because of the seepage of water into

the stores constructed on the first portion of the development.

"During the latter part of 1955 or early months of 1956 Mr. Goode determined to build the extension in this case. This portion of the development was to be constructed over a low lying area in which fill dirt had been deposited, making allowance for a basement, which ultimately became the site of the C-3, or J. C. Penny store. At first he intended to build the extension and in preparation for that ordered the necessary structural steel from Dietrich Brothers, steel fabricators, in Baltimore. Dietrich accepted his order provided achitectural plans could be placed in his hands by June 1, 1956, and promised to deliver the steel about November, 1956, but did not guarantee delivery, steel then being in short supply due to a recent steel strike. The architectural drawings were not sent to Dietrich by June 1, but some of them were forwarded later in June. Goode then changed his order with Dietrich to a steel tonnage basis. Because of ill health he decided to seek bids from contractors for the construction of the extension rather than build it himself, based upon plans and specifications and other documents and addenda prepared by Louis H. Asbury and Associates, Architects. The invitations for bids produced the one submitted by the plaintiffs, which resulted in the contract between the parties, dated August 29, 1956. The bid or proposal submitted by the plaintiffs recited that the 'undersigned bidder having carefully examined the plans, specifications, and other documents and addenda, visited the site and being familiar with all requirements of the site.'

"Embodied in the contract upon which the bid was submitted were included the general conditions of the contract, specifications, and drawings. The specifications contained Addendum No. 1, which states that:

'Structural Steel has been purchased from Dietrich Brothers, Baltimore, Maryland, for two hundred, fifty-nine dollars and thirty cents ($259.30) per ton. Total tonnage may be obtained from Dietrich. Delivery is promised for November, 1956, but not guaranteed. Bidder should include cost of all structural steel in his proposal. Should increase in price occur

before delivery, Owners will pay any increased tonnage price.'

By Article 2 of the Contract it was provided:

'The work to be performed under this Contract shall be commenced immediately and shall be substantially completed in 330 days.'

There was no stipulation as to liquidated damages, if any.

"The general conditions of the contract, in Article 18 dealing with delays and extension of time, states that:

'If the Contractor be delayed at any time in the progress of the work by any act or neglect of the Owner or the Architect, or of any employee of either, or by any separate Contractor employed by the Owner, or by changes ordered in the work, or by strikes, lockouts, fire, unusual delay in transportation unavoidable casualties or any causes beyond the Contractor's control, or by delay authorized by the Architect pending arbitration, or by any cause which the Architect shall decide to justify the delay, then the time of completion shall be extended for such reasonable time as the Architect may decide.

'No such extension shall be made for delay occurring more than seven days before claim therefor is made in writing to the Architect. In the case of a continuing cause of delay, only one claim is necessary.' "

I

After the appellees' bid had been received and examined, the owners signed and forwarded, in accordance with the specifications, a formal written agreement, dated August 29, 1956, for execution by the appellees. This instrument is called a "contract proposal" by the appellees, who claim that it contained provisions not suggested or included in the invitation to bid or the appellees' bid proposal. The bond that the appellees were required to furnish was obtained on September 12, and thereafter, on September 19, two copies of

the agreement were executed on behalf of the appellees and mailed to the owners. This agreement, as above stated, provided that the "work performed under this contract shall be commenced immediately and shall be substantially completed in 330 days."

A dispute arose in the trial below as to whether August 29, 1956, the date named in the written agreement, or September 19, 1956, the date when it was executed by the appellees, should prevail in computing the starting date for the 330-day period. The chancellor concluded that under the authority of *District of Columbia v. Camden Iron Works,* 181 U. S. 453, 461,[1] the appellees could show by parol evidence that the contract, though dated August 29, 1956, on its face, was in fact not executed and delivered until September 19, 1956, and it took effect only from such date of delivery. The appellants, in their original brief, did "not challenge the validity of this rule," but contended the real issue was not to determine *"when* the parties became legally bound" by the contract, but by *"what* terms they became legally bound." In their reply brief, they seem to shift their position so as to contend that a binding and effectual contract was "in effect since August 22, 1956, when the Contractor's bid was accepted."

The application of a few fundamental principles of contract law will solve the problem. It is universally held that a manifestation of mutual assent is an essential prerequisite to the creation or formation of a contract. It is likewise universally agreed that it is possible for parties to enter into a binding informal or oral agreement to execute a written contract; and, if the parties contemplate that an agreement between them shall be reduced to writing before it shall become binding and complete, there is no contract until the writing is signed. And the intention of the parties in this respect must be determined by the facts and circumstances in each particular case. *Peoples Drug Stores v. Fenton,* 191

---

1. In this case the contract provided for completion within 136 days "after the date of the execution of the contract." The Court held that there could be shown by parol evidence the actual date of the execution and delivery of the contract, though subsequent to the date on its face, and the deed took effect from the date of its delivery.

Md. 489, 493, 62 A. 2d 273; *Power Service Corporation v. Joslin,* 175 F. 2d 698, 702, 703 (9th Cir., 1949); 1 *Williston, Contracts* (Rev. Ed.), Sec. 28. It is, likewise, just as broadly and consistently held that parol evidence is inadmissible to vary, alter or contradict a writing which is complete and unambiguous, where no fraud, accident or mistake is claimed, *Glass v. Doctors Hospital, Inc.,* 213 Md. 44, 57, 131 A. 2d 254; but where doubt arises as to the true sense and meaning of the words themselves or difficulty as to their application under the surrounding circumstances, the sense and meaning of the language may be investigated and determined by evidence *dehors* the instrument. *Vary v. Parkwood Homes, Inc.,* 199 Md. 411, 418, 86 A. 2d 727; *Rinaudo v. Bloom,* 209 Md. 1, 11, 120 A. 2d 184.

The chancellor, by his above ruling, in effect held that the parties contemplated that their agreement would be reduced to writing before it would become binding; that the appellees, before September 19, 1956, had not manifested their assent to the final formation of a contract and were, therefore, at liberty to withdraw from the negotiations prior to such manifestation, *Peoples Drug Stores v. Fenton, supra,* 191 Md. at page 494; that the parties did not agree to commence work "immediately" as of August 29, 1956 (as contended by the appellants) when they, at that time, had not finally and conclusively agreed upon the contract; that the language which states the "work performed under this contract shall be commenced immediately" is ambiguous when the starting time is not certain, hence the parol evidence was admissible; and that the parties intended this language to apply to September 19, 1956, the date when the agreement was finally executed by the appellees and delivered to the appellants.

We think the parol evidence was admissible for the purpose offered; and we are unable to say that any of the above findings of fact were clearly erroneous. Maryland Rule 886.

The appellants cited five out-of-state and federal cases which they claim support their side of the point being here considered. Due to the difference of the language used and the attendant circumstances, we think all of them are distinguishable. It would unduly prolong this opinion, which

must be lengthy due to the many questions raised by the appellants, to discuss them in detail. We find no error in the court's ruling upon this point.

## II

The court below found that the contractor was entitled to an extension of time of 145 days under the provisions of Addendum No. 1 and Article 18, set forth above, because of a delay in the delivery of structural steel, holding that such delay was a cause "beyond the contractor's control." The appellants assign no less than four reasons as to why this was error: (a) Conditions in the steel industry resulting from a prior strike, which were well known to the contractors at the time of their bid, cannot be construed to be a condition beyond its control under Article 18; (b) the maximum extension of time that could be granted under Article 18—assuming appellants' argument to be wrong under (a)— is thirty-five days, being the maximum length of time the progress of the work was delayed; (c) the court below erred in failing to find the contractors were responsible for a part of the delay in the delivery of the structural steel; and (d) the contractor was not entitled to any extension of time under Article 18, as it did not comply with the notice provision thereof.

## (a)

The appellants contend that the chancellor erred in allowing the contractors credit for any delay due to a shortage of steel caused by a previous strike in the steel industry. They argue the contractors undertook an unconditional obligation under the contract "to substantially complete" the project in 330 days; that under the circumstances surrounding the making of the agreement, it was reasonable to assume that the contractors guarded against the uncertainty of delivery of the structural steel by making an allowance for such delay in computing the time for the substantial completion of the work, and they cite the cases of *State, to Use of Lane v. Dashiell,* 195 Md. 677, 689-690, 75 A. 2d 348, *Link Belt Engineering Co. v. United States,* 142 F. 243 (E.D. Pa., 1905), and *Max-*

*well v. United States,* 3 F. 2d 906, 909-910 (4th Cir., 1925), *aff'd* 271 U. S. 647, as authority for their contention. We find no fault with the chancellor's interpretation of this part of the contract. By the express terms thereof, the contractors were not to be responsible for any delay in the progress of the work for "any causes beyond the Contractor's control." The evidence is conclusive that the failure of delivery of the structural steel was occasioned by a "cause beyond the Contractor's control." In the *Dashiell* and *Maxwell* cases, the obligations assumed, unlike the case at bar, were unconditional. The *Link Belt Engineering Co.* turned upon an interpretation of a definition of "unavoidable delays" contained in the contract involved.

### (b) and (c)

We think the trial court properly disposed of these questions in the following manner:

> "In considering this aspect of the case it should be remembered that immediately prior to and contemporaneous with the execution of the contract it was common knowledge that structural steel was in short supply due to a recent steel strike. It was evidently with this in mind that Mr. Goode undertook to order steel for the project early in April when he himself expected to do the construction work. The parties dealt upon the basis that Goode's order with Dietrich was the only practical source of supply for the necessary structural steel. The testimony and exhibits indicate that the condition under which Dietrich promised, but did not guarantee, delivery of steel in November, had not been fulfilled by Mr. Goode, nor the architect, prior to June 1, because the architectural drawings had not been forwarded before that time. Moreover, the evidence indicates that Minnix did all that might have been reasonably required of him to expedite the fabrication of the steel by Dietrich and its delivery upon completion of the preliminary construction.
>
> "The Court concludes that it is apparent from the

testimony that the date when structural steel would be available was an important factor in Minnix's proposal to complete the work within 330 days. The failure to deliver adequate steel until April 24, 1957, can not be attributed to any failure on the part of Minnix, or indeed by Dietrich, which was his only practical source of supply. The causes for the delay, while possibly contributed to by the lateness in furnishing architectural drawings, were doubtless due to the conditions in the steel industry following the recent strike. * * *·

"Much of the defendants' testimony was devoted to criticism of the progress of the preliminary work necessary before erection of the structural steel. They apparently take the position that if the plaintiffs were entitled to an extension because of failure to deliver steel the extension should only be for a 35 day period between March 21, 1957, when preliminary work was completed, and April 24, 1957, when steel was delivered in sequence. Although Minnix learned as early as [the] Fall of 1956 that he could not expect delivery of steel until Spring, the defendants say that he should have augmented his crew of workmen at greater expense to complete the preliminary work earlier in order to be reasonably entitled to an extension. Had he undertaken to do this rather than minimize his expenses it would have availed the defendants nothing, nor could it have shortened the period within which the building could have been completed after delivery of steel. See *Jefferson Hotel Co. v. Brumbaugh,* 168 F. 867, 874 (4th Cir., 1909).

"It is urged by defendants' counsel that this case should be governed by the decision in *Schmulbach v. Caldwell,* 196 F. 16 (4th Cir., 1912), which distinguishes the *Jefferson Hotel* case. The Court does not feel that this is justified because the contract here involved does not, as in the *Schmulbach* case, have a mutual provision for measured or liquidated

damages. It is not necessary to apply the rationale of either the *Hotel* or the *Schmulbach* case because, as the Court views it, the plaintiff did not cause, nor control the cause of, the delay in delivering steel and should have been entitled to an extension of 145 days within which to substantially complete the contract. This would extend the time of completion until January 6, 1958. The principle of apportionment of blame for delay enunciated in the *Schmulbach* case does not apply here because the Court exonerates both the plaintiff and the defendant from blame for the delay, and merely finds that in accordance with Article 18 of the General Conditions the contractor was delayed due to the strike by a cause beyond his control, and that the architect should have granted the 145 day extension."

(d)

When we arrive at this point, the appellants present their last argument on the question under consideration. They claim the evidence shows conclusively that no written claim requesting an extension of time because of delay was submitted to the architect or the owners within the time required by Article 18; and assert delay in structural steel relied upon was for the 145-day period between December 1, 1956, and April 24, 1957, and, since the request for an extension was not submitted until May 16, 1957, it was too late to be effective. There is little doubt that when properly relied upon and properly presented, the courts have required strict compliance with provisions of this nature. *Olson Construction Co. v. Commercial Building & Investment Co.*, 256 N. W. 22 (Nebr., 1934).

However, we think the appellants waived such compliance in the case at bar. They admit in their brief that "structural steel was in critical supply during that period because of a strike in the steel industry," and "the difficulties encountered in obtaining structural steel were generally known throughout the construction industry at this time." They also knew that Dietrich had not been furnished the architectural draw-

ings by June 1, 1956, as originally contemplated when Dietrich agreed to try to supply the steel during November, 1956. As early as January, 1957, Goode wrote to the appellees stating that he was "very much disturbed at the progress you are making or are not making" on the shopping center. In May, 1957, the appellees made a formal written request to the appellants' architect for an extension of 145 days, basing the same upon abnormal sub-surface water conditions, additional footage of piles driven and the delay in obtaining the structural steel. This letter specifically pointed out that the contemplated date for the delivery of the steel was during November, 1956, but not enough was delivered until April 24, 1957, "to warrant the start of the erection." This clearly pin-pointed the period for which the extension was being requested, namely, from December 1, 1956, through April 24, 1957, all of which period had occurred "more than seven days before" the claim for an extension was being made. Nevertheless, the appellants' architect in denying the request in writing made no mention of, or claim concerning, the lapse of time before the appellees made the written request, basing his refusal upon the grounds that there were no abnormal sub-surface water conditions, the specifications stated that the footage of piling could not be predetermined and with reference to the steel, "[a]s we see it, from then on [after the appellees had conferred with Dietrich] it was a matter between you and Dietrich," and "[a]side from the above, according to the daily reports we get, you were only ready for steel a week or so before it was delivered anyway, and * * * there are not one-third enough men erecting this steel." Furthermore, after the appellees had filed their bill of complaint, the appellants filed an answer and an amended answer, in both of which the principal defense alleged was that the appellees "had without just cause or excuse * * * failed and refused to complete or substantially complete construction within said 330 days," but no mention whatsoever was made in either pleading concerning the lapse of time before appellees' claim for an extension of time. In addition, when the letter containing appellees' request for the extension of time was offered in evidence, no objection thereto was made; and

the first time that the failure to make the request on time was advanced or relied upon as a defense was in a memorandum brief filed with the chancellor nearly a month after oral argument.

There is nothing new or novel in waiver by conduct, writings and pleading or failing to plead. There has never been a comprehensive and fully satisfactory definition of waiver, but it is safe to say that estoppel is not an essential element of waiver in Maryland and waiver may take place after the time for filing notice or proof of loss in insurance cases. *McElroy v. John Hancock Mut. Life Ins. Co.*, 88 Md. 137, 149-151, 41 A. 112; *Fidelity & Casualty Co. v. Riley*, 168 Md. 430, 438, 439, 178 A. 250, and cases therein cited. It is unnecessary to formulate or state any precise rule on the subject that would apply to all cases and under all circumstances, and we need not discuss it at length; since this Court, through Judge Hammond, has recently had occasion to go into the matter quite thoroughly in the case of *Foard v. Snider*, 205 Md. 435, 446-451, 109 A. 2d 101. There, the question arose as to whether an option to purchase a farm and personal property had been exercised seasonably or in proper form by a letter from the optionee to the optionor. In holding that the optionors had waived any such possible defenses, the Court said:

> "We do not decide whether a tender was essential * * * or whether the letter of October 19, 1950 would meet the test as an acceptance, because, as we see it, the appellees waived any defense they might have that the exercise of the option was not seasonably made or made in proper form. They chose to rely consistently, as they have done here, on their contention that the terms of the option agreement were too indefinite to be binding."

Without further elaboration, we think the facts set out above bring this case well within the ruling of the *Foard* case; and, as stated above, the appellants have waived the right to rely upon the failure to make the request for an extension of time due to delay within the period provided in Article 18.

## III

The chancellor found that the shopping center had been substantially completed by the appellees on December 28, 1957. The appellants claim that it was not so completed until January 28, 1958, and the court was clearly erroneous (Rule 886 a) in this ruling. The ruling, of course, involved essentially a question of fact. We have carefully examined the evidence, and we do not conclude that the chancellor was clearly wrong in his holding.

## IV

The chancellor made an allowance to the appellees for excessive costs incurred by them for undisclosed, unusual subsurface conditions, plus a 10% profit allowance thereon. He assigned two reasons for doing so: (1) A provision of Article 15 of the general conditions of the contract which states that "[s]hould conditions encountered below the surface of the ground be at variance with the conditions indicated by the drawings and specifications the contract sum shall be equitably adjusted upon claim by either party made within a reasonable time after the first observance of the conditions"; and (2) that the appellants knew of the unusual sub-surface conditions and failed to disclose the same to the appellees. The appellants argue that the finding of the chancellor as to the location of the sub-surface water table was clearly erroneous, that even if not clearly erroneous it was not a condition at variance with conditions indicated on the plans and specifications, that the evidence does not support the finding of the chancellor that the owners knew the location of the water table and under no circumstances should the contractor be allowed the 10% profit on the extra work. We agree with the chancellor. While there was some evidence to the contrary, there was ample testimony to support his finding on the location of the water table. The witness Hutchinson, a graduate of Carnegie Institute of Technology of Pittsburgh with a B. S. degree in physics, testified he had studied the science of hydraulics; that as a superintendent on the subject construction he observed the water rising in the excavations; that based upon his knowledge of hydraulics and his experience

and observations, the water table was just about where the chancellor found it to be. And he was supported by a number of other witnesses, one of whom stated that he had lived "right across the road" for twelve years, that a portion of the area upon which the shopping center was built was a swamp before the fill; and that water lay in it all the time where he, on occasions, had caught bull frogs. We certainly cannot, on the record presented, hold that the chancellor was clearly erroneous in this finding of fact. And, without setting forth the testimony in further detail, the same applies to his finding that the appellants knew the location of the water table. With reference to the claim that the sub-surface situation was not at variance with conditions "indicated on the plans and specifications," the plans and specifications made no mention of the sub-surface conditions to be expected or encountered, but Allen C. Minnix, one of the plaintiffs, who is a civil engineer with some 43 years' experience in the construction business, testified that a water table in such close proximity to proposed construction should be shown on the plans and a failure to do so indicated, "that there was no difficulty as far as water problems would be concerned in the construction of the building." Also the waterproofing which was made in one of the basement floor slabs was only provided by amendment to the contract by a change order. And the architect testified that he doubted that he would have designed such a slab without waterproofing had he known the water table was where the chancellor found it to be, and that good architectural practice would possibly have dictated that it should have been noted on the plans. Under these circumstances, we think the chancellor was justified in finding "a condition at variance with the plans and specifications." Concerning the allowance by the chancellor of the 10% profit on the extra work that was caused by the unexpected sub-surface condition, the language quoted from Article 15 of the general conditions is broad enough to permit this ruling. In addition, Article 3 of the contract provides, "any extra work will be on a cost plus 10% basis."

The appellants further argue that the case of *Cowan, Inc. v. Meyer,* 125 Md. 450, 465-468, 94 A. 18, should control the

outcome of this case. In that case, the Court quoted, with approval, from *United States v. Gleason,* 175 U. S. 588, as follows: "[T]he Supreme Court said that one of the well-settled rules of law 'is that if a party by his contract charge himself with an obligation possible to be performed, he must make it good, unless his performance is rendered impossible by the act of God, the law, or the other party. Difficulties, even if unforeseen, and however great, will not excuse him. If parties have made no provisions for a dispensation, the rule of law gives none * * *.'" However, the promise in that case was unconditional and there was no knowledge of an unusual condition that was not disclosed such as that present in the case at bar.

Turning now to the second ground assigned by the chancellor for his ruling on the contention now being considered, the Supreme Court of Michigan in the case of *Valentini v. City of Adrian,* 79 N. W. 2d 885 (1956), in a carefully written, well reasoned opinion held that a contractor could recover for excessive costs in the construction of a sewer due to subsoil quicksand and excessive water conditions, known to the defendant city but not disclosed to the contractor. During the course of its opinion, the Court stated at page 887:

> "The withholding by the city of its knowledge of the known conditions, resulting in excessive cost of construction, forms an actionable basis for plaintiff's claim for damages. Nor does the requirement that the contractor examine the specifications and make a personal examination of the site bar the plaintiff from recovering damages caused by the undisclosed subsoil conditions."

As stated above, we find no error in the chancellor making an allowance to the appellees for the excessive costs due to the unusual sub-surface conditions mentioned above.

## V

The chancellor made the appellees allowances for eight specific items as extras under the contract at the specified rate for change orders of cost plus 10% profit allowance. The

appellants contest each and every such allowance on individual grounds and all on the general grounds of failure to comply with procedural provisions of the contract relating to written notice to the architect and written authorization from him to entitle the contractor to charge for extras. It would serve no useful purpose to consider each item separately, even if the question were properly before us. An examination of the record discloses that the allowances were proper. However, everything we stated under II (d) applies with equal force to this contention, and, in addition, the present question was not raised in argument; so no mention thereof was made in the pleadings, the evidence or the argument below. We do not think the question is properly before us. Rule 885.

## VI

Under this heading, the appellants claim they were entitled to recoup $450.15 that they paid to a waterproofing company for stopping leaks in the basement of one of the stores, and the sum of $236.00, which was the amount of a premium paid by them to bond off a mechanics' lien filed by subcontractors and suppliers. It has been seen above that much of the work was performed in very close proximity to, and some actually partially below, the water table. During the course of construction, the owners, in an apparent effort to insure a dry basement, modified the contract by Change Order No. I, which provided for the inclusion of an integral waterproofing material in the cement in lieu of the contract provision for pargeting. The appellees did not warrant the specifications in regard to waterproofing. The appellants did not establish a failure to comply with the specifications, nor did they show any lack of skill or workmanship on the part of the appellees, but state, "the contractor was required under its contract to provide the owners with a basement free from leaks." They fail, however, to point out in the contract such obligation on the part of the appellees; hence, in the absence of a showing of failure to comply with the specifications or of lack of skill or care, we think the chancellor was correct in his ruling. *Gaybis v. Palm,* 201 Md. 78, 93 A. 2d 269.

There is no foundation for the appellants' claim of set-off for the premium paid to release the subject property from the mechanics' lien filed by subcontractors and suppliers. Article 32 of the General Conditions of the contract, upon which appellants rely for this claim, provides that if any lien remain unsatisfied *after all payments* by the owners to the contractors, the contractors shall refund to the owner all moneys that the latter may be compelled to pay in discharging such a lien, including all costs and reasonable attorneys' fees. We have seen above that "all payments" have not as yet been made to the contractors; consequently, the contractors are not liable for the expense of discharging this lien.

## VII

In their seventh contention, the appellants claim error in several of the chancellor's rulings on evidence. We shall not discuss them in detail. If we assume, without deciding, that the chancellor were in error, as contended by the appellants, the rulings would not change the result reached herein; consequently, there could be no reversible error involved.

## VIII

The chancellor allowed the appellees interest on their claim from December 28, 1957, the date when the shopping center was substantially completed. In this, he was in error. Under the previous decisions of this Court interest should have been allowed only from the date of the filing of the mechanics' lien for record, which was February 26, 1958. *Hensel v. Johnson,* 94 Md. 729, 737, 51 A. 575; *T. Dan Kolker, Inc. v. Shure,* 209 Md. 290, 303, 121 A. 2d 223. The decree will, therefore, be modified accordingly, and, as modified, affirmed.

> *Decree modified so as to allow the appellees interest from February 26, 1958, and, as modified, affirmed, the appellants to pay the costs.*