K & G CONSTRUCTION COMPANY *v.*
HARRIS ET AL.

[No. 4, September Term, 1960.]

306

*Decided October 24, 1960.*

The cause was argued before BRUNE, C. J., and HENDER-SON, HAMMOND, PRESCOTT and HORNEY, JJ.

*Frank P. Flury,* for appellant.

*Leonard S. Blondes,* for appellees.

PRESCOTT, J., delivered the opinion of the Court.

Feeling aggrieved by the action of the trial judge of the Circuit Court for Prince George's County, sitting without a jury, in finding a judgment against it in favor of a subcontractor,[1] the appellant, the general contractor on a construction project, appealed.

The principal question presented is: Does a contractor, damaged by a subcontractor's failure to perform a portion of his work in a workmanlike manner, have a right, under the circumstances of this case, to withhold, in partial satisfaction of said damages, an installment payment, which, under the terms of the contract, was due the subcontractor, unless the negligent performance of his work excused its payment?

The appeal is presented on a case stated in accordance with Maryland Rule 826 g.

The statement, in relevant part, is as follows:

\* \* \*

"K & G Construction Company, Inc. (hereinafter called Contractor), plaintiff and counter-defendant in the Circuit Court and appellant herein, was owner and general contractor of a housing subdivision project being constructed (herein called Project). Harris and Brooks (hereinafter called Subcontractor), defendants and counter-plaintiffs in the Circuit Court and appellees herein, entered into a contract with Contractor to do excavating and earth-moving work on the Project. Pertinent parts of the contract are set forth below:

---

1. There are two appellees; the statement of the case refers to them as "subcontractor." We shall do likewise.

"Section 3. The Subcontractor agrees to complete the several portions and the whole of the work herein sublet by the time or times following:

'(a) Without delay, as called for by the Contractor.

'(b) It is expressly agreed that time is of the essence of this contract, and that the Contractor will have the right to terminate this contract and employ a substitute to perform the work in the event of delay on the part of Subcontractor, and Subcontractor agrees to indemnify the Contractor for any loss sustained thereby, provided, however, that nothing in this paragraph shall be construed to deprive Contractor of any rights or remedies it would otherwise have as to damage for delay.

'Section 4. (b) Progress payments will be made each month during the performance of the work. Subcontractor will submit to Contractor, by the 25th of each month, a requisition for work performed during the preceding month. Contractor will pay these requisitions, less a retainer equal to ten per cent (10%), by the 10th of the months in which such requisitions are received.[2]

'(c) No payments will be made under this contract until the insurance requirements of Sec. 9 hereof have been complied with.

'Section 5. The Contractor agrees—

'(1) That no claim for services rendered or materials furnished by the Contractor to the Subcontractor shall be valid unless written notice thereof is given by the Contractor to the Subcontractor during the first ten days of the calendar month following that in which the claim originated.

* * *

'Section 8. * * * All work shall be performed in a workmanlike manner, and in accordance with the best practices.

---

2. This section is not a model for clarity.

'Section 9. Subcontractor agrees to carry, during the progress of the work, * * * liability insurance against * * * property damage, in such amounts and with such companies as may be satisfactory to Contractor and shall provide Contractor with certificates showing the same to be in force.'

"While in the course of his employment by the Subcontractor on the Project, a bulldozer operator drove his machine too close to Contractor's house while grading the yard, causing the immediate collapse of a wall and other damage to the house. The resulting damage to contractor's house was $3,400.00. Subcontractor had complied with the insurance provision (Sec. 9) of the aforesaid contract. Subcontractor reported said damages to their liability insurance carrier. The Subcontractor and its insurance carrier refused to repair damage or compensate Contractor for damage to the house, claiming that there was no liability on the part of the Subcontractor.

"Contractor gave no written notice to Subcontractor for any services rendered or materials furnished by the Contractor to the Subcontractor.

* * *

"Contractor was generally satisfied with Subcontractor's work and progress as required under Sections 3 and 8 of the contract until September 12, 1958, with the exception of the bulldozer accident of August 9, 1958.

"Subcontractor performed work under the contract during July, 1958, for which it submitted a requisition by the 25th of July, as required by the contract, for work done prior to the 25th of July, payable under the terms of the contract by Contractor on or before August 10, 1958. Contractor was current as to payments due under all preceding monthly requisitions from Subcontractor. The aforesaid bulldozer accident damaging Contractor's house occurred on August 9, 1958. Contractor refused to pay Subcontractor's requisition due on August 10,

1958, because the bulldozer damage to Contractor's house had not been repaired or paid for. Subcontractor continued to work on the project until the 12th of September, 1958, at which time they discontinued working on the project because of Contractor's refusal to pay the said work requisition and notified Contractor by registered letters of their position and willingness to return to the job, but only upon payment. At that time, September 12, 1958, the value of the work completed by Subcontractor on the project for which they had not been paid was $1,484.50.

"Contractor later requested Subcontractor to return and complete work on the Project which Subcontractor refused to do because of nonpayment of work requisitions of July 25 and thereafter. Contractor's house was not repaired by Subcontractor nor compensation paid for the damage.

"It was stipulated that Subcontractor had completed work on the Project under the contract for which they had not been paid in the amount of $1,484.50 and that if they had completed the remaining work to be done under the contract, they would have made a profit of $1,340.00 on the remaining uncompleted portion of the contract. It was further stipulated that it cost the Contractor $450.00 above the contract price to have another excavating contractor complete the remaining work required under the contract. It was the opinion of the Court that if judgment were in favor of the Subcontractor, it should be for the total amount of $2,824.50.

"* * * Contractor filed suit against the Subcontractor in two counts: (1), for the aforesaid bulldozer damage to Contractor's house, alleging negligence of the Subcontractor's bulldozer operator, and (2) for the $450.00 costs above the contract price in having another excavating subcontractor complete the uncompleted work in the contract. Subcontractor filed a counterclaim for recovery of work of the value

of $1,484.50 for which they had not received payment and for loss of anticipated profits on uncompleted portion of work in the amount of $1,340.00. By agreement of the parties, the first count of Contractor's claim, i.e., for aforesaid bulldozer damage to Contractor's house, was submitted to jury who found in favor of Contractor in the amount of $3,400.00. Following the finding by the jury, the second count of the Contractor's claim and the counterclaims of the Subcontractor, by agreement of the parties, were submitted to the Court for determination, without jury. All of the facts recited herein above were stipulated to by the parties to the Court. Circuit Court Judge Fletcher found for counter-plaintiff Subcontractor in the amount of $2,824.50 from which Contractor has entered this appeal."

The $3,400 judgment has been paid.

It is immediately apparent that our decision turns upon the respective rights and liabilities of the parties under that portion of their contract whereby the subcontractor agreed to do the excavating and earth-moving work in "a workmanlike manner, and in accordance with the best practices," with time being of the essence of the contract, and the contractor agreed to make progress payments therefor on the 10th day of the months following the performance of the work by the subcontractor.[3] The subcontractor contends, of course, that when the contractor failed to make the payment due on August 10, 1958, he breached his contract and thereby released him (the subcontractor) from any further obligation to perform. The contractor, on the other hand, argues that the failure of the subcontractor to perform his work in a workmanlike manner constituted a material breach of the contract, which justified his refusal to make the August 10 payment; and, as there was

3. The statement of the case does not show the exact terms concerning the remuneration to be paid the subcontractor. It does not disclose whether he was to be paid a total lump sum, by the cubic yard, by the day, or in some other manner. It does state that the excavation finally cost the contractor $450 more than the "contract price."

no breach on his part, the subcontractor had no right to cease performance on September 12, and his refusal to continue work on the project constituted another breach, which rendered him liable to the contractor for damages. The vital question, more tersely stated, remains: Did the contractor have a right, under the circumstances, to refuse to make the progress payment due on August 10, 1958?

The answer involves interesting and important principles of contract law. Promises and counter-promises made by the respective parties to a contract have certain relations to one another, which determine many of the rights and liabilities of the parties. Broadly speaking, they are (1) independent of each other, or (2) mutually dependent, one upon the other. They are independent of each other if the parties intend that *performance* by each of them is in no way conditioned upon *performance* by the other. 5 *Page, The Law of Contracts,* ¶ 2971. In other words, the parties exchange promises for promises, not the *performance* of promises for the *performance* of promises. 3 *Williston, Contracts* (Rev. Ed.), ¶ 813, n. 6. A failure to perform an independent promise does not excuse non-performance on the part of the adversary party, but each is required to perform his promise, and, if one does not perform, he is liable to the adversary party for such non-performance. (Of course, if litigation ensues questions of set-off or recoupment frequently arise.) Promises are mutually dependent if the parties intend *performance* by one to be conditioned upon *performance* by the other, and, if they be mutually dependent, they may be (a) precedent, *i.e.,* a promise that is to be performed before a corresponding promise on the part of the adversary party is to be performed, (b) subsequent, *i.e.,* a corresponding promise that is not to be performed until the other party to the contract has performed a precedent covenant, or (c) concurrent, *i.e.,* promises that are to be performed at the same time by each of the parties, who are respectively bound to perform each. *Page, op. cit.,* ¶¶ 2941, 2951, 2961.

Professor Page, *op. cit.,* ¶ 2971, says there are three classes of independent promises left: (1) those in which the acts to be performed by the respective parties are, by the terms of the

contract, to be performed at fixed times or on the happening of certain events which do not bear any relation to one another; (2) those in which the covenant in question is independent because it does not form the entire consideration for the covenants on the part of the adversary party, and ordinarily forms but a minor part of such consideration; and (3) those in which the contract shows that the parties intended performance of their respective promises without regard to performance on the part of the adversary, thus relying upon the promises and not the performances (Cf. *Brown v. Fraley,* 222 Md. 480, 161 A. 2d 128).

In the early days, it was settled law that covenants and mutual promises in a contract were *prima facie* independent, and that they were to be so construed in the absence of language in the contract clearly showing that they were intended to be dependent. *Williston, op. cit.,* ¶ 816; *Page, op. cit.,* ¶¶ 2944, 2945. In the case of *Kingston v. Preston,* 2 Doug. 689, decided in 1774, Lord Mansfield, contrary to three centuries of opposing precedents, changed the rule, and decided that performance of one covenant might be dependent on prior performance of another, although the contract contained no express condition to that effect. *Page, op. cit.,* ¶ 2946; *Williston, op. cit.,* ¶ 817. The modern rule, which seems to be of almost universal application, is that there is a presumption that mutual promises in a contract are dependent and are to be so regarded, whenever possible. *Page, op. cit.,* ¶ 2946; Restatement, *Contracts,* ¶ 266. Cf. *Williston, op. cit.,* ¶ 812.

While the courts assume, in deciding the relation of one or more promises in a contract to one or more counter-promises, that the promises are dependent rather than independent, the intention of the parties, as shown by the entire contract as construed in the light of the circumstances of the case, the nature of the contract, the relation of the parties thereto, and the other evidence which is admissible to assist the court in determining the intention of the parties, is the controlling factor in deciding whether the promises and counter-promises are dependent or independent. *Page, op. cit.,* ¶ 2948; *Williston, op. cit.,* ¶ 824. *Pollak v. Brush Electric Ass'n,* 128 U. S. 446; *Bryne v. Dorey* (Mass.), 109 N. E. 146; *Rosenthal*

*Paper Co. v. Nat'l Folding Box & Paper Co.* (N. Y.), 123 N. E. 766. Restatement, *Contracts,* ¶¶ 258, 261.[4]

Considering the presumption that promises and counter-promises are dependent and the statement of the case, we have no hesitation in holding that the promise and counter-promise under consideration here were mutually dependent, that is to say, the parties intended performance by one to be conditioned on performance by the other; and the subcontractor's promise was, by the explicit wording of the contract, precedent to the promise of payment, monthly, by the contractor. In *Shapiro Eng. Corp. v. Francis O. Day Co.,* 215 Md. 373, 380, 137 A. 2d 695, we stated that it is the general rule that where a total price for work is fixed by a contract, the work is not rendered divisible by progress payments. It would, indeed, present an unusual situation if we were to hold that a building contractor, who has obtained someone to do work for him and has agreed to pay each month for the work performed in the previous month, has to continue the monthly payments, irrespective of the degree of skill and care displayed in the performance of work, and his only recourse is by way of suit for ill-performance. If this were the law, it is conceivable, in fact, probable, that many contractors would become insolvent before they were able to complete their contracts. As was stated by the Court in *Measures Brothers Ltd. v. Measures,* 2 Ch. 248, 262 [1910] : "Covenants are to be construed as dependent or independent according to the intention of the parties and the good sense of the case."

We hold that when the subcontractor's employee negligently damaged the contractor's wall, this constituted a breach of the subcontractor's promise to perform his work in a "workmanlike manner, and in accordance with the best practices." *Gaybis v. Palm,* 201 Md. 78, 85, 93 A. 2d 269; *Johnson v. Metcalfe,* 209 Md. 537, 544, 121 A. 2d 825; 17 C. J. S. *Contracts,* ¶ 515; *Weiss v. Sheet Metal Fabricators,* 206 Md. 195. 203, 110 A. 2d 671. And there can be little doubt that the breach

---

4. For a discussion of Sergeant Williams' note to the case of Pordage v. Cole, 1 Wms. Saunders 319, relating to the construction to be given promises and counter-promises, see Williston, op. cit., ¶¶ 819, 820, 821, 822; Page, op. cit., ¶ 2947.

was material: the damage to the wall amounted to more than double the payment due on August 10. *Speed v. Bailey,* 153 Md. 655, 661, 662, 139 A. 534. 3 A *Corbin, Contracts,* ¶ 708, says: "The failure of a contractor's [in our case, the subcontractor's] performance to constitute 'substantial' performance may justify the owner [in our case, the contractor] in refusing to make a progress payment * * *. * * * If the refusal to pay an installment is justified on the owner's [contractor's] part, the contractor [subcontractor] is not justified in abandoning work by reason of that refusal. His abandonment of the work will itself be a wrongful repudiation that goes to the essence, even if the defects in performance did not." See also Restatement, *Contracts,* ¶ 274; *F. H. McGraw & Co. v. Sherman Plastering Co.,* 60 F. Supp. 504, 512 (D. C. Conn.), *aff.* 149 F. 2d 301; *De Forest Radio Tel. & Tel. Co. v. Triangle Radio Supply Co., Inc.* (Ct. App. N. Y.), 153 N. E. 75; *Lander v. Samuel Heller Leather Co.* (Sup. Jud. Court of Mass.), 50 N. E. 2d 962; *Norwood Paper Co. v. Columbia Paper Bag Co.* (C. A. 4th), 185 Fed. 454; *Nathan B. Bradley v. Andrew T. King,* 44 Ill. 339, and compare *Williston, op. cit.,* ¶¶ 805, 841 and 842. Professor Corbin, in ¶ 954, states further: "The unexcused failure of a contractor to render a promised performance when it is due is always a breach of contract * * *. Such failure may be of such great importance as to constitute what has been called herein a 'total' breach. * * *. For a failure of performance constituting such a 'total' breach, an action for remedies that are appropriate thereto is at once maintainable. Yet the injured party is not required to bring such an action. He has the option of treating the nonperformance as a 'partial' breach only * * *." In permitting the subcontractor to proceed with work on the project after August 9, the contractor, obviously, treated the breach by the subcontractor as a partial one. As the promises were mutually dependent and the subcontractor had made a material breach in his performance, this justified the contractor in refusing to make the August 10 payment; hence, as the contractor was not in default, the subcontractor again breached the contract when he, on September 12, discontinued work on the project, which rendered him liable (by the express terms

of the contract) to the contractor for his increased cost in having the excavating done—a stipulated amount of $450. Cf. *Keystone Eng. Corp. v. Sutter,* 196 Md. 620, 628, 78 A. 2d 191.

The appellees suggest two minor points that may be disposed of rather summarily. They argue that the contractor "gave no written notice to subcontractor for any services rendered or materials furnished by the contractor to the subcontractor," in accordance with the terms of the contract. It is apparent that the contractor's claim against the subcontractor for ill-performance did not involve, in any way, "services rendered or materials furnished" by the contractor; hence, the argument has no substance. They also contend that the contractor had no right to refuse the August 10 payment, because the subcontractor had furnished the insurance against property damage, as called for in the contract. There is little, or no, merit in this suggestion. The subcontractor and his insurance company denied liability. The furnishing of the insurance by him did not constitute a license to perform his work in a careless, negligent, or unworkmanlike manner; and its acceptance by the contractor did not preclude his assertion of a claim for unworkmanlike performance directly against the subcontractor.

> *Judgment against the appellant reversed; and judgment entered in favor of the appellant against the appellees for $450, the appellees to pay the costs.*