# IN THE COURT OF APPEALS OF IOWA

No. 14-1131
Filed June 10, 2015

**NEWTON MANUFACTURING
COMPANY,**
     Plaintiff-Appellee,

**vs.**

**DOYLE CLEMMONS, d/b/a
MAXXSTAR, LLC,**
     Defendant-Appellant.
_____

**DOYLE CLEMMONS, d/b/a
MAXXSTAR, LLC,**
     Counterclaim Plaintiff,

**vs.**

**NEWTON MANUFACTURING
COMPANY,**
     Defendant to Counterclaim.
_____

     Appeal from the Iowa District Court for Jasper County, Randy V. Hefner, Judge.

     An independent contractor appeals the district court's ruling in a breach-of-contract lawsuit.  **AFFIRMED.**

     Whitney C. Judkins of Fiedler & Timmer, P.L.L.C., Urbandale, and Brett Charhon and Martin C. Robson of Charhon Callahan Robson & Garza, PLLC, Dallas, Texas, for appellant.

     Christopher P. Jannes of Davis, Brown, Koehn, Shors & Roberts, PC, Des Moines, for appellee.

     Heard by Tabor, P.J., and Bower and McDonald, JJ.

**TABOR, P.J.**

This case involves a series of contracts between Newton Manufacturing Company (Newton), an Iowa business specializing in promotional materials, and Doyle Clemmons, an independent contractor from Texas who sold Newton's products. Their working relationship broke down in 2012 when Clemmons placed orders with a local competitor. Thereafter, Newton terminated its June 2012 sales agreement with Clemmons, effective November 2012. At the time of the termination, Clemmons owed Newton more than $58,000 in incentives Newton had advanced under the parties' previous contracts. Newton sued to recover the incentive balance, and Clemmons, as an affirmative defense, claimed Newton materially breached the 2012 sales agreement, excusing his own performance. Clemmons also counterclaimed for unpaid commissions involving a software product. The district court ruled Clemmons owed Newton for the incentives, Newton owed Clemmons unpaid commissions for the software product for November and December 2012, and Newton's failure to pay those two months of commissions was not a material breach. The court rejected Clemmons's "assignment" counterclaim. Finding no error, we affirm.

## I. Background Facts and Proceedings

Newton produces promotional materials for sales purposes with its business divided between "core" business and "corporate programs." The "core" business includes one-time orders for items such as coffee mugs, pens, calendars, or tee shirts. The "corporate-program" offers website products.

Newton entered agreements with independent contractors to sell its products and paid them commissions.

    **A. Newton-Clemmons Contracts.** On January 1, 2004, Newton and Clemmons, who was doing business as sole proprietorship Maxxstar, entered into the first of their three written contracts. The 2004 contract was for four years, until December 31, 2008, and established a commission and bonus schedule for Clemmons. Under this contract, Newton advanced Clemmons $150,000 as a one-time "Initial Incentive" and also advanced a one-time "Volume Incentive" of $35,000, or $185,000 in total incentive payments. These payments were in consideration for Clemmons (1) providing Maxxstar's customer list to Newton, (2) supplementing the customer list, and (3) granting Newton "exclusive relationships with the client accounts named therein." The parties agreed "any violation of this right of exclusivity will constitute a material breach of this Agreement."

    As for repayment of the incentives, for each contract year in which Clemmons achieved his annual sales goals, Newton would annually amortize or reduce "$37,000 of the $185,000 sum." If Clemmons failed to achieve his sales goal in any contract year, no amortization would occur for that contract year. If the contract was terminated before the incentives had been fully amortized, Clemmons agreed to pay Newton the unpaid incentive balance.

    In 2008 Clemmons and Newton entered into their second contract for another four years, from July 1, 2008, to June 30, 2012. This contract recognized Clemmons had not achieved the sales goals necessary to fully

amortize the 2004 contract's incentive payments, and Newton agreed to pay Clemmons "a one-time incentive payment of $185,000 (the "Initial Incentive") less the unamortized balance from the [2004] sales agreement of $18,500" or $166,500. As before, the incentive was in consideration of Clemmons providing his customer list and granting Newton "exclusive relationships with the client accounts named therein." Under this contract, the incentive balance would be amortized at $46,250 per year if Clemmons achieved his sales goals. As before, Clemmons agreed to repay Newton any unpaid incentive balance.

**B. Merge 9i Contracts.** In the meantime, Paragon Consulting of North Florida, LLC (Paragon) developed the concept and process for a software application, PB2.9, a performance-improvement program for employers. The program could be customized to reward employees with points for achieving goals relevant to the employer's specific business, such as attendance, production, and safety. In 2008 Newton worked with Paragon to further develop and sell the software application, and Newton and Paragon subsequently entered into an "intellectual property license and purchase agreement" (L&P contract). While Newton and Paragon jointly developed the branding for the program, Newton developed and owned "software to collect participant points, design and print scorecards, and provide management reporting." Newton also designed and owned "software to interface with clients, maintain performance improvement program websites, and administer point redemptions." Newton became the sole owner of the trademark, Merge 9i, associated with the performance-improvement program. Unlike Newton's other products, the sale of Merge 9i required a more

intensive, more detailed, and more technical sales campaign. Additionally, Newton needed to offer substantial customer service after the sale.

Newton agreed to pay its sales personnel a commission based on the "points awarded" under a Merge 9i contract between Newton and the employer-company. On June 16, 2009, Clemmons and Jim Burt of Houston, Texas, signed an agreement to evenly split commissions for their first two sales of Merge 9i contracts on Newton's behalf. Newton was not a signatory to this agreement. Burt had a personal relationship with David Russell, the president of IFCO, a pallet manufacturer. Burt introduced Russell to Clemmons, and Clemmons's post-introduction efforts resulted in IFCO's initial interest in the Merge 9i program. Clemmons's active involvement in procuring the IFCO sales contract then ended, and Burt, Newton's upper management, and Paragon's Peter and Robin Krstovic held meetings with IFCO's upper management to close the sale. On September 18, 2009, Newton and IFCO executed a three-year contract licensing IFCO to use the Merge 9i program. The Newton-IFCO contract was the first sale under the Clemmons-Burt commission-split contract.

Under the Newton-IFCO contract, Newton provided post-sale administrative services, such as assigning points to employees, providing IFCO with monthly points statements, processing employee redemption orders, and preparing billing statements. Either party could terminate the contract by providing sixty days written notice to the non-terminating party. Thus, IFCO could end the contract if it was unhappy with the program or with Newton's administration of the program.

Burt spent significant time servicing the IFCO contract, while Clemmons did not. Clemmons admitted that because Burt, Larry Bayliss of Newton, and Krstovic of Paragon were servicing the contract, IFCO "remained a client of Newton."[1] Under the IFCO contract, Newton invoiced IFCO on a monthly basis for "points awarded," IFCO paid Newton, and Newton then paid the sales commission. Despite Newton's belief Burt was entitled to the entire IFCO sales commission, Newton directly paid Clemmons his percentage under the Burt-Clemmons contract.

**C. Third Newton-Clemmons Contract.** During the second Newton-Clemmons contract, Clemmons was not meeting his sales goals; consequently, Newton amortized only a small portion of the 2008 sales contract's incentive balance. On April 1, 2010, Newton and Clemmons executed an addendum stating Newton would not amortize $46,250 for the year 2009 and also stating Clemmons still owed Newton more than $150,000 of the previously advanced "initial incentive."

With the 2008 Newton-Clemmons contract set to expire on June 30, 2012, Clemmons, assisted by counsel, sent Newton a proposal for a new sales contract in early May 2012. Clemmons proposed the 2004 and 2008 agreements be "mutually terminated" with the parties having "no further obligations," including his incentive debt. Clemmons believed he could increase his income by taking his

---

[1] If neither party gave official notice of intention to renew or terminate within sixty days of September 18, 2012, the Newton-IFCO contract continued for twelve months on the same terms. It appears the Newton-IFCO contract was eventually renewed for one year to September 18, 2013. The other Merge 9i client for which Clemmons received a commission from Newton was Air Liquide. But Air Liquide exercised the sixty-day out provision and dropped the Merge 9i program.

business "direct" and therefore proposed to "cease selling core business, printing and promotional items" while continuing to market the Merge 9i program. Although Clemmons proposed Newton "will continue to pay Clemmons for all existing Merge 9i contracts (IFCO . . .), for the life of the contract and on any contract renewals in the future," this language was not included in the final 2012 contract with Newton.

At the end of May 2012, Newton's treasurer, Jeffrey Stolp, responded with a draft contract recognizing Clemmons's obligation to repay Newton the unamortized incentive balance of $63,571.72. Newton agreed Clemmons could continue to market Merge 9i and proposed twenty-five percent of his Merge 9i commissions, for the first time, be used to reduce the incentive balance. This term was included in the final contract. Finally, Stolp included a margin comment on the Merge 9i commission paragraph, paragraph 3(a): "Our intent is to pay commissions through the life of the client contract not the [Newton-Clemmons] Sales Agreement." The language in the comment was not included in the final contract, but paragraph 3(a) was not changed in the final contract.

On June 12, 2012, Newton and Clemmons executed the sales agreement at issue, which varied significantly from the Clemmons draft:

> RECITALS
> J. The Parties agree that Clemmons has an obligation to repay Newton the Incentive Balance of $63,571.72 in conformity with the terms and conditions set forth below.
> . . . .
> 2. BASIC UNDERSTANDING. The Parties hereby agree the July 1, 2008 Sales Agreement and the April 1, 2010 Addendum to Sales Agreement (collectively, the "Prior Agreements") are hereby mutually terminated . . . . The parties also agree that this mutual termination is prospective in effect, and does not impact any rights

and/or obligations that accrued while the [2008 Sales] Agreement and [2010] Addendum were in existence.

    3. PAYMENT OF COMMISSIONS.

        a. <u>Merge 9i</u>. Commissions will be earned and paid according to a commission schedule of forty percent (40%) of the invoiced amounts for points awarded only . . . . Newton will pay seventy-five percent of each month's commission directly to Clemmons. The remaining twenty-five percent (25%) . . . will be applied to the Incentive Balance . . . until such time as the Incentive Balance [is] paid-in-full. In the event that all monies owed are not paid-in-full through the application of commissions, Newton retains all rights with regard to said sums.

The 2012 sales contract defined "points awarded" and also established commissions for "Core Sales" and "Corporate Programs." Unlike the prior contracts with Newton, the 2012 sales contract (1) removed Clemmons's obligation to meet a minimum revenue threshold, (2) did not include an exclusivity provision, and (3) did not set an ending date.

The record supports the district court's finding that at the time the parties executed the June 2012 sales contract, neither Newton nor Clemmons "anticipated terminations of [Newton's] sale, development, and administration of Merge 9i programs, and specifically did not anticipate [Newton's] discontinuation of its involvement with the IFCO contract." After the June 2012 Newton-Clemmons contract was executed, Newton continued to pay Clemmons his share of IFCO commissions under the Burt-Clemmons contract but applied twenty-five percent of Clemmons's share to the unpaid incentive balance.

**D. Newton Terminates License with Paragon.** Also during the summer of 2012, Newton's new president ordered a detailed analysis of the productivity of Newton's various business lines, including Merge 9i. The analysis showed Merge 9i was not profitable. Accordingly, Newton's management decided to exit

the sale and administration of the Merge 9i program, entered into negotiations with Paragon, and on January 30, 2013, terminated its L&P contract with Paragon, effective December 31, 2012. Regarding the September 2009 Newton-IFCO contract, the Newton-Paragon termination and mutual release agreement assigned Newton's rights to Paragon. In turn and also on January 30, 2013, Paragon assigned to Quality Incentive Company (Quality Incentive), a Tennessee corporation, its newly obtained rights. Quality Incentive separately contracted with some of the salespersons who had previously marketed Merge 9i for Newton, including Burt. In his deposition testimony, Clemmons indicated he talked with Quality Incentive about becoming a sales representative for them on Merge 9i business.[2] But at trial, Clemmons insisted he "had no intention of working through Quality Incentive." The record supports the district court's findings: "The essential purpose underlying Newton's decision to discontinue development and marketing of Merge 9i was to eliminate substantial losses. Newton's decision was not motivated by an intent to defraud sales persons generally, or Clemmons specifically, of commissions."

**E. Newton Terminates the 2012 Clemmons Contract.** Returning to the Clemmons-Newton relationship, Newton inadvertently received correspondence

---

[2] During his deposition Clemmons testified:

> Q. Have you ever approached either Paragon or Quality Incentive Company to attempt to negotiate a sales representative agreement whereby you could represent them to obtain commissions on Merge 9i business? A. I did talk to Quality Incentive. I don't remember the date. It is probably around the same time I was preparing to leave because I was very familiar with Quality's business. They were the fulfillment provider behind all our programs. And I talked to the owner, and he did agree that if I would like to work with them that he would be more than happy to have me join them.

showing Clemmons was placing orders with Newton's direct competitor, The Vernon Company (Vernon), also located in Newton, Iowa. Newton believed Clemmons's placement of client orders with Vernon violated an oral "gentleman's agreement" to place this business with Newton. In contrast, Clemmons testified nothing prevented him from doing business through Vernon. Clemmons admitted after the June 2012 sales agreement was executed, he did not take all of his "core business direct but instead [he] placed some of it with Vernon." Clemmons also admitted Newton's exhibits showed he "offered" products through Vernon to his clients before the Newton-Clemmons 2008 contract's exclusivity clause expired, but Clemmons insisted he did not "transact business" though Vernon until after the 2012 contract (without an exclusivity clause) was executed—"offering and transacting business are two different things." At the time of trial, Clemmons was acting as sales representative for Vernon.

As a result of the Vernon-Clemmons interactions, Newton sent Clemmons an October 16, 2012 letter terminating the June 2012 sales agreement—a contract of indefinite duration—as of November 15, 2012. As of November 15, Clemmons was to "cease and desist" from representing himself "as associated with Newton Manufacturing or with the Merge 9i product." Newton stated it would pay Clemmons commissions on sales "earned" prior to November 15, 2012, "in accordance with the terms of the" 2012 contract and "subject to the amortization and repayment rights." Newton stated the term, "earned," did not include "merely introducing an independent contractor [Burt] to Newton." Newton demanded Clemmons repay $58,138.36 in incentive payments and proposed terms for a

promissory note. Although Newton had paid Clemmons IFCO commissions under the Burt-Clemmons contract from the time IFCO commissions were originally generated in December 2009, Newton did not pay Clemmons IFCO commissions for November and December 2012. Instead, Newton paid Burt the IFCO commissions for those two months ($29,346.57). Stolp testified Newton had never paid a sales contractor a commission after terminating the independent contractor relationship. The record supports the district court's findings:

> In various documents directed to sales personnel, and to encourage marketing of Merge 9i, Newton would describe commissions earned on Merge 9i sales as an "annuity." This was an obvious reference to the fact that commissions on the sale of Merge 9i would be recurring, unlike commissions earned on other sales of promotional materials.

Under the Paragon-Newton termination and mutual release contract, any commissions generated on the IFCO account after December 31, 2012, belonged to Paragon/Quality, who now serviced IFCO's use of Merge 9i, including invoicing and receiving payment from IFCO for "points awarded."

**F. Litigation.** In February 2013 Newton sent Clemmons a draft of a promissory note for the unpaid incentive amounts advanced to Clemmons in 2008. Clemmons did not respond. On May 19, 2013, Newton sued Clemmons to recover $54,194.88. Clemmons answered and asserted the affirmative defense of Newton's prior material breach of the June 2012 contract—failing to pay Clemmons his post-termination IFCO commissions. He also asserted counterclaims against Newton based on its alleged breaches of the June 2012 sales contract: (1) Newton's failure to pay Clemmons his IFCO commissions, and

(2) Newton assigning the obligations in the sales agreement to Paragon without Clemmons's consent.

After a bench trial, the district court ruled Newton proved Clemmons owed $54,194.88 for the unpaid incentive balance "subject to the claim for additional commissions." The court also ruled Clemmons was entitled to $14,673.29, Clemmons's one-half of the IFCO November/December 2012 commissions Newton paid Burt "based upon two separate grounds." First, because (1) Burt voluntarily contracted to pay one-half to Clemmons in return for assistance with the IFCO contract and (2) Stolp testified he considered Newton bound by the Clemmons-Burt agreement, Newton "thus ratified that contract and was bound to continue the practice of paying each party one-half of those commissions." As to the second ground:

> [T]he comment authored by Stolp in the draft . . . stated Merge 9i commissions would be paid "through the life of the client contract not the Sales Agreement." Significantly, paragraph 3(a) of that draft was not changed in the final draft. The contract was drafted by [Newton] and interpreted in this manner by its agent [Stolp]. The language from the draft survived into the final contract. Stolp testified this comment assumed the [contractor] would remain associated with [Newton], but the comment did not say this and a reasonable person, even with knowledge of [Newton's] past practice, would not have inferred that this was an additional condition. Though [Newton] had never paid a [contractor] a commission after termination, the Merge 9i agreements were unique . . . . [Stolp's specific interpretation] in his comment to paragraph 3 trumps the evidence of past business practice.[3]

---

[3]  The district court's footnote stated:
> I realize [this interpretation] could have resulted in Clemmons receiving IFCO commissions long after his disassociation from [Newton] had [Newton] not terminated its Merge 9i business. But that would have been Burt's problem, not [Newton's].

The court denied Clemmons's counterclaim which asserted he was entitled to IFCO commissions in the range of $66,000 to $80,000 *after* December 31, 2012.[4] The court found the term "client contract" in Stolp's margin comment referred to Newton's "direct contract with IFCO, and that contract . . . terminated effective December 31, 2012."[5] Clemmons does not appeal this ruling.[6] The court also rejected Clemmons's "assignment" counterclaim. Clemmons does not appeal the district court's denial of his other counterclaims asserting Newton's breach of a covenant of good faith and fair dealing, unjust enrichment, and fraud/fraudulent inducement. The court found: "As used in the context of this case, [Newton] used the term 'annuity' to refer to the fact that commissions would be recurring. It did not use this term with the intent to deceive."

---

[4] At trial, Clemmons testified:

> Q. You cannot cite to me any document, any contract, or any other obligation that Newton entered into with Paragon by which [Newton was] obligated to pay you a commission for business they no longer had on IFCO, that is true, isn't it, sir? A. I see no language in this [sales] agreement that states that.
>
> Q. And in fact there is no language in any agreement that you are aware of that grants you that right to commissions, correct? A. There is no document that I can see.

[5] The court recognized Newton, who thereafter did not invoice IFCO for "points awarded," was not obligated to pay Clemmons a commission on revenue generated under the Paragon/Quality-IFCO contracts, ruling: "The only logical conclusion . . . is that if there was no invoicing, there would be no commission."

[6] We note Clemmons's motion for new trial claimed only that Newton's failure to pay two months of commission was a material breach and did not claim entitlement to post-December 31, 2012 commissions as a factor to be considered in the material-breach analysis. On appeal, Clemmons raises post-December 31, 2012 commissions as a factor in the material-breach analysis for the first time in his reply brief, stating "Clemmons contends Newton owed commissions for a minimum of fifteen months, ten of which were to be post-termination commissions." An issue raised for the first time in a reply brief is not properly presented to this court. *Harrington v. Univ. of N. Iowa,* 726 N.W.2d 363, 366 n.2 (Iowa 2007).

The court entered judgment in favor of Newton for $39,521.59. Clemmons filed a motion for new trial raising two grounds. First, he claimed the "court erred as a matter of law when it determined that Newton substantially performed under the sales agreement and that its breach of the sales agreement was not material." Second, he claimed the court's "finding Newton did not assign the obligations in the sales agreement to Paragon" constitutes error because the finding is contrary to Stolp's testimony. The district court denied the motion. Clemmons now appeals.

## II. Standard of Review

Our standard of review of the district court's ruling on a motion for new trial depends on the grounds raised in the motion. *Pavone v. Kirke*, 801 N.W.2d 477, 496 (Iowa 2011). If the motion is based on a legal question, we review for the correction of errors at law. *Id.* Because the question whether Newton's breach of the 2012 sales contract constituted a prior "material" breach is a legal question and because the district's court's interpretation of the 2012 sales contract's "assignment" paragraph is also a legal question, we review for corrections of errors at law. *See id.* The district court's findings of fact are binding on us if supported by substantial evidence. Iowa R. App. P. 6.904(3)(a).

## III. Clemmons's Affirmative Defense—Prior Material Breach by Newton

The district court rejected Clemmons's affirmative defense, ruling:

A breach is material if it results in performance that "is not substantial." *Flynn Builders, L.C. v. Lande*, 814 N.W.2d 542, 546 (Iowa 2012). Even given that [Newton] should have paid Clemmons his share of Burt's commissions for November and December 2012, this failure was not substantial in the context of the entire agreement.

**A. Newton's Performance by Percent of Completion.** On appeal, Clemmons contends the district court erred as a matter of law in determining Newton substantially performed the 2012 sales agreement and Newton's breach was not material. Noting the court determined Clemmons was entitled to IFCO commissions for seven months through December 31, 2012, and Newton paid only five months, Clemmons contends Newton materially breached the sales agreement by failing to pay 28.5% of the contract term (two of seven months) and failing to pay over 30% of the term's value ($14,673.29 (two months) of $47,855.09 (seven months)). Clemmons contends because Newton did not substantially perform under the contract as to both contract term and value, he is thereby excused from repaying the incentive balance. *See Flynn*, 814 N.W.2d at 546 (finding the construction contractor's omissions "materially affected the habitability of the house"; only 80 to 85% of the construction contract was completed).

In response, Newton contends Clemmons's argument is premised on too tight of a time frame. Newton points out the Clemmons-Burt commission-split contract was executed in June 2009 and Newton, aware of the contract, consistently paid Clemmons his share of Burt's commissions. Newton states the undisputed facts show it started paying IFCO commissions to Clemmons and Burt in December 2009, paying Clemmons through October 2012 while paying Burt through December 2012. Newton asserts it substantially performed—in the three-year time frame it did not pay Clemmons for only two months, and during

the three-year period, it paid Clemmons over $178,000 while only failing to pay $14,673.29.

The percentage arguments advanced by both parties are a more natural fit in the context of construction contracts than in service contracts. But after analyzing both positions we conclude Newton's time frame is more in line with the district court's unchallenged first ground above—holding Newton owed Clemmons two months of commissions *because* Newton ratified the Clemmons-Burt contract. This holding shapes our understanding that Newton's obligation to pay two months of commission was derived from the Clemmons-Burt contract, a split that Clemmons and Burt agreed to overlay on the IFCO-Newton contract and a split that Newton ratified and substantially performed by paying Clemmons IFCO commissions from December 2009 through October 2012. *See id.* (citing with approval a contract treatise that states a "'breach of a contract is not material if substantial performance has been rendered'") (citation omitted).

Newton's position is also more in line with the district court's unchallenged second ground above—holding the Merge 9i contracts were unique and Newton agreed to pay Clemmons the Merge 9i commissions "through the life of the client contract [IFCO-Newton] not the Sales Agreement." Here, the life of the client contract is from December 2009 through December 2012, and Newton paid Clemmons his commissions for all but two months of the "life of the client contract."

**B. Restatement (Second) of Contracts section 241.** Turning to the Restatement provisions cited by both parties, we find further support for our

conclusion the district court did not err in holding Newton's failure to pay two months of IFCO commissions was not a prior material breach. Section 241 identifies five significant circumstances for courts to consider "in determining whether a particular failure is material." Restatement (Second) of Contracts § 241 cmt. a (1981). These include: (1) the extent to which Clemmons "will be deprived of the benefit he reasonably expected"; (2) the extent to which Clemmons "can be adequately compensated for the part of that benefit of which he will be deprived"; (3) the extent to which Newton "will suffer forfeiture"; (4) the likelihood Newton will cure its failure, taking account of all circumstances including any reasonable assurances; and (5) the extent to which Newton's behavior "comports with standards of good faith and fair dealing." *See id.*

As to the benefit he reasonably expected, Clemmons claims: "Specifically, the benefit Clemmons reasonably expected was to be compensated for his efforts to sell certain products, including the Merge 9i product, for the life of those contracts." We agree and note the Newton-IFCO contract ended on December 31, 2012. Regarding the extent to which Clemmons can be compensated for the benefit of which he was deprived—two months of commissions—section 241 comment c states: "If the failure is a breach, [Clemmons] always has a claim for damages, and the question becomes one of the adequacy of that claim to compensate him for the lost benefit." *Id.* § 241 cmt. c. Here, the monetary damages the district court awarded adequately compensate Clemmons for the lost benefit. Third, in analyzing the extent to which Newton will suffer forfeiture, we consider whether Newton "has relied substantially on the expectation of the

exchange, as through preparation or performance." *Id.* § 241 cmt. d. Specifically,

> a failure is less likely to be regarded as material if it occurs late, after substantial preparation or performance, and more likely to be regarded as material if it occurs early, before such reliance. For the same reason the failure is more likely to be regarded as material if such preparation or performance as has taken place can be returned to and salvaged by the party failing to perform or tender and less likely to be regarded as material if it cannot.

*Id.* Newton's substantial preparation or performance already occurred because it provided the incentive payments in 2004 and 2008, well in advance of the June 2012 sales contract. In fact, the 2012 sales contract only contemplated Clemmons's repayment through an offset of a percentage of IFCO Merge 9i commissions because Clemmons did not meet his sales goals under the prior two contracts, leaving an unpaid debt.

Fourth, as to the likelihood Newton will cure the failure, the Restatement provides: "A material failure by [Newton] gives [Clemmons] the right to withhold further performance as a means of securing [Clemmons's] expectation of an exchange of performances. To the extent, that [Clemmons's] expectation is reasonably secure, in spite of [Newton's] failure, there is less reason to conclude [Newton's] failure is material." *See id.* § 241 cmt. e. In the circumstances of this case, Clemmons's expectation is undisputedly "reasonably secure" because the district court offset the commission owed to Clemmons against the unpaid incentive balance owed to Newton. Based on the court's order, there is less reason to conclude Newton's failure is material.

Fifth and finally, the Restatement states: "the extent to which the behavior of the party failing to perform [Newton] comports with standards of good faith and fair dealing is, however, a significant circumstance in determining whether [Newton's] failure is material." *See id.* § 241 cmt. f. At trial, Clemmons admitted the 2012 sales contract did not "address whether commissions will be paid after the termination of the agreement." In addition, the record supports the district court's conclusions: (1) Newton discontinued the Merge 9i program in order to eliminate substantial losses and this decision "was not motivated by an intent to defraud sales persons generally, or Clemmons specifically, of commissions"; and (2) Newton did not, at any time, engage "in an act of bad faith with respect to the contract" and "at all times acted within its rights as defined in the contract." Lastly, Clemmons has not appealed the district court's rejection of his counterclaims for breach of covenant of good faith and fair dealing and fraud/fraudulent inducement.

Accordingly, every one of the five "significant circumstances" in the Restatement supports our conclusion that the district court did not err in ruling Newton's breach was not material.

**C. Total Repudiation.** Buried in the material-breach argument in Clemmons's brief is his conclusory claim the district court "erred in awarding Newton damages for Clemmons's subsequent refusal to pay the Incentive Balance. Where a party terminates a contract, a party totally repudiates the contract."

We find no merit to this challenge because Clemmons overlooks (1) the contractual sources forming the basis for his obligation to repay Newton, i.e., the 2008 contract under which Newton made the incentive payment and the 2010 addendum, and (2) the interplay between the 2008/2010 preexisting debt obligation and the subsequent 2012 contract. The district court recognized the 2012 sales agreement did not affect the 2008 contract/2010 addendum's preexisting debt obligation when it specifically found: "Under the [2012 sales agreement] as signed, "the 2008 agreement was terminated, but the termination was deemed 'prospective in effect' and did not 'impact any rights and/or obligations that accrued while the Agreement and Addendum were in existence.'" Accordingly, Clemmons's claim that Newton's action of terminating the 2012 "at will" sales contract excused him from his preexisting and unmodified 2008/2010 obligation to repay the incentive balance is contrary to the express intent of the parties.

## IV. Alleged Assignment of Clemmons's Sales Representative Contract

Paragraph 8(g) of the Newton-Clemmons sales contract stated: "No Party shall assign or delegate its rights or obligations under this Agreement voluntarily or involuntarily, whether by merger, consolidation, dissolution, operation of law, or other manner, without the prior written consent of all other Parties." Clemmons contends paragraph 8(g) means Newton did not have the right to assign its obligation to pay Clemmons his IFCO commissions without Clemmons's prior written consent. Clemmons also claims the court erred in

finding Newton "did not assign any of its contracts with its sales representatives to Paragon." In support, Clemmons cites Stolp's trial testimony:

> Q. . . . [T]he obligation to pay commissions in connection with the contracts like IFCO contract was assigned along with the contract, right? A. Yes.
> . . . .
> Q. Let's take a look at the sales agreement . . . . You just told me that the obligation to pay commissions in connection with the IFCO contract was assigned to a third party, right? A. Yes. Because they were receiving the revenue.

The district court denied relief on this issue, holding:

> [Newton] did not assign the Clemmons 2012 contract to IFCO. That contract had been terminated. Newton did not assign any of its contracts with sales representatives to Paragon. In fact, Quality Incentive entered into separate contracts with certain sales representatives.
> Clemmons had no right to receive commissions from [Newton] on the [Newton-IFCO] contract once that contract had been assigned to Paragon and [Newton] was no longer generating revenue for services performed in connection with that contract. Clemmons had no contractual rights which were assigned to Paragon.

Newton asserts it did not assign the Newton-Clemmons sales contract to Paragon as shown by section 3 of the Newton-Paragon termination agreement, stating Newton assigns and Paragon accepts "Newton's right, title, interest, and obligation in and to the various Merge 9i Employee Recognition Program Agreements." Clemmons's testimony supports Newton's position:

> Q. If you look at . . . the 2012 sales agreement, you would agree with me there is no language in that particular agreement that indicates you had the right to receive notice that Newton was assigning the [Newton-]IFCO Merge 9i agreement; that is correct, isn't it? A. I see no language of that.
> Q. . . . [I]t's your contention [Newton] is obligated to pay you commissions based upon invoices generated by . . . Paragon or Quality Incentive, from which Newton shares none of the revenue going forward. That's your contention . . . for IFCO? A. My

contention is that the exit of Newton's business and the Merge 9i business they could have easily negotiated with Pete Krstovic and Paragon that they would continue paying me what I had earned and what I brought in. It would have been a simple, simple solution to all this wasted money and litigation. Now why was that not done?

Even assuming an inconsistency exists between Stolp's testimony on one hand and Clemmons's testimony and the specific language of the Paragon-Newton contract on the other hand, we conclude the district court did not err in resolving this issue.

Costs of this appeal are taxed to Clemmons.

**AFFIRMED.**

McDonald, J., concurs specially.

**MCDONALD, J.** (concurring specially)

The parties raised the issue of material breach and substantial performance in the district court. Clemmons argued Newton breached the 2012 agreement, the breach was material, and the material breach excused Clemmons from further performance. Newton argued the breach was immaterial because it had substantially performed the 2012 agreement. The district court concluded Newton's failure to pay two months' commission "was not substantial in the context of the entire agreement." On appeal, the parties continue to frame the question as whether Newton substantially performed the 2012 agreement, relying on the Restatement (Second) of Contracts section 241. This appears to me to be the wrong question. The doctrine of substantial performance is almost always inapplicable where the performance at issue is merely the payment of money. The uncured failure to pay money owed is almost always a material breach. Nonetheless, I respectfully concur in the result that Clemmons is obligated to repay the incentive payment subject to offset for his counterclaim on the ground that the issue of substantial performance/material breach is simply inapplicable here where the parties expressly made their promises independent rather than dependent.

"In the area of contracts, substantial performance is performance without a material breach, and a material breach results in performance that is not substantial." *Flynn Builders, L.C. v. Lande*, 814 N.W.2d 542, 546 (Iowa 2012). A breach by one party gives rise to a claim for damages, but a material breach by one party gives rise to a claim for damages and may excuse performance by the

non-breaching party. *See In re Interstate Bakeries Corp.*, 751 F.3d 955, 962-63 (8th Cir. 2014) ("Substantial performance is the antithesis of material breach; if it is determined that a breach is material, or goes to the root or essence of the contract, it follows that substantial performance has not been rendered, and further performance by the other party is excused." (quoting 15 Richard A. Lord *Williston on Contracts* § 44:55, at 271-72 (4th ed. 2014) [hereinafter "Williston"])); *Williams v. AgriBank*, *FCB*, 972 F.2d 962, 966 (8th Cir. 1992) ("It is not every dissatisfaction with a contract performance, nor even every breach—but only a material breach—that excuses performance by the other party."); *Ryko Mfg. Co. v. Eden Servs.*, 823 F.2d 1215, 1239 (8th Cir. 1987) (recognizing that under Iowa law a material breach excuses performance by the non-breaching party). "Substantial performance is that which, despite deviations from the contract requirements, provides the important and essential benefits of the contract to the promisee." *SDG Macerich Props., L.P. v. Stanek, Inc.*, 648 N.W.2d 581, 586 (Iowa 2002). Substantial performance allows omissions or deviations from the contract that are inadvertent or unintentional, that are not the result of bad faith, and that do not impair the structure as a whole. *See Moore's Builder & Contractor, Inc. v. Hoffman*, 409 N.W.2d 191, 193 (Iowa Ct. App. 1987).

I conclude the doctrine of substantial performance is almost always inapplicable where the performance at issue is merely the payment of money. The issue of substantial performance typically arises in the context of construction, personal service, and similar agreements where, due to the nature of the work performed, uncertainty exists as to whether a party performed or

substantially performed the contracted-for service. *See Domanik Sales Co., Inc. v. Paulaner-N. Am. Corp.*, 2000 WL 1855144, at *2 (Wis. Ct. App. 2001) ("The precedents explaining the application of the doctrine involve personal service or construction contracts and the aim to cure minor imperfections that are inevitable in such situations."). In this case, the performance at issue is the payment of money. "This is not a situation involving personal service or construction inherently subject to imprecise performance." *Id.* Either payment was made according to the 2012 agreement or it was not. It was not. That is a breach. *See Licocci v. Cardinal Assocs., Inc.*, 492 N.E.2d 48, 52 (Ind. Ct. App. 1986) ("A party who fails to make payments as required by a contract is guilty of a breach thereof.").

We should not place judicial imprimatur on the notion that a party to a contract can establish substantial performance and the entitlement to return performance merely by showing the payment of some undetermined percentage less than the contracted-for obligation. This notion has been rejected by other jurisdictions. *See, e.g., Walden v. Schaefer*, No. D036907, 2002 WL 467959, at *2 (Cal. Ct. App. Mar. 28, 2002) ("The 'substantial performance' doctrine applies chiefly in the construction industry . . . . Schaefer cites no authority suggesting the doctrine applies to an installment payment agreement."); *Fidelity Bank v. Krenisky*, 807 A.2d 968, 979 (Conn. Ct. App. 2002) (rejecting application of substantial performance doctrine and stating "to allow mortgagors to make partial payments on their mortgages, and then avoid foreclosure by way of a claim of substantial performance, would result in the unsettling of the real estate market

and an increase in litigation"); *In re Standard Jury Instructions—Contract & Bus. Cases*, 116 So.3d 284, 307 (Fla. 2013) ("There is almost always no such thing as 'substantial performance' of payment between commercial parties when the duty is simply the general one to pay."); *Rose v. Ditto*, 804 So.2d 351, 353 (Fla. Dist. Ct. App. 2001) ("There is almost always no such thing as "substantial performance" of payment . . . when the duty is simply the general one to pay. Payment is either made in the amount and on the due date, or it is not."); *Enriquillo Exp. & Imp., Inc. v. M.B.R. Indus., Inc.*, 733 So.2d 1124, 1127 (Fla. Dist. Ct. App. 1999) (same); *Ujdur v. Thompson*, 878 P.2d 180, 183 (Idaho Ct. App. 1994) (rejecting argument that payment of ninety percent of amount owed was substantial performance); *Gibson v. Neu*, 867 N.E.2d 188, 196 (Ind. Ct. App. 2007) (rejecting application of substantial performance doctrine where mortgagee owed only $500 on note); *Hill v. Goodwin*, 722 S.W.2d 668, 671-72 (Tenn. Ct. App. 1986) ("[W]e are not convinced that substantial performance of a contract for the sale of real estate will entitle the vendee to specific performance of that agreement.").

I conclude the questions of substantial performance/material breach are not presented here for an additional reason. The issue of material breach arises only when the parties' promises are dependent. When the promises are independent, the doctrine of substantial performance/material breach is generally inapplicable. *See generally Lloyd v. Pendleton Land & Exploration, Inc.*, 22 F.3d 623, 625 (5th Cir. 1994) (stating "the critical issue is whether the obligation avoided was dependent upon or correlative to the obligation allegedly

breached"); Eric G. Andersen, *A New Look at Material Breach in the Law of Contracts*, 21 U.C. Davis L. Rev. 1073, 1077 (1988) (explaining the doctrine of material breach arises to mitigate the harshness of discharging the obligation of future performance where there are constructive conditions of exchange). As one court explained:

> Promises and counter-promises made by the respective parties to a contract have certain relations to one another, which determine many of the rights and liabilities of the parties. Broadly speaking, they are (1) independent of each other, or (2) mutually dependent, one upon the other. They are independent of each other if the parties intend that *performance* by each of them is in no way conditioned upon *performance* by the other. In other words, the parties exchange promises for promises, not the *performance* of promises for the *performance* of promises. A failure to perform an independent promise does not excuse non-performance on the part of the adversary party, but each is required to perform his promise, and, if one does not perform, he is liable to the adversary party for such non-performance. (Of course, if litigation ensues questions of set-off or recoupment frequently arise.) Promises are mutually dependent if the parties intend *performance* by one to be conditioned upon *performance* by the other, and, if they be mutually dependent, they may be (a) precedent, i.e., a promise that is to be performed before a corresponding promise on the part of the adversary party is to be performed, (b) subsequent, i.e., a corresponding promise that is not to be performed until the other party to the contract has performed a precedent covenant, or (c) concurrent, i.e., promises that are to be performed at the same time by each of the parties, who are respectively bound to perform each.

*K & G Constr. Co. v. Harris*, 164 A.2d 451, 454-55 (Md. 1960) (citations omitted).

Whether promises are dependent or independent is determined by the intent of the parties. *See id.* at 455 (stating "the intention of the parties, as shown by the entire contract as construed in the light of the circumstances of the case, the nature of the contract, the relation of the parties thereto, and the other evidence which is admissible to assist the court in determining the intention of

the parties, is the controlling factor in deciding whether the promises and counter-promises are dependent or independent"). Here, the parties' course of dealing and the plain language of the 2012 agreement establish the promises were independent of each other. The incentive payment obligation arose from prior agreements of the parties; it was not an obligation created by the 2012 agreement. Paragraph (J) in the Recitals to the 2012 Agreement acknowledges the preexisting obligation to repay the debt. Other language in the 2012 agreement establishes the independent nature of the promises. Paragraph 2 of the 2012 agreement explicitly provides that "any rights and/or obligations that accrued" while the prior agreements were in effect were not impacted by the 2012 agreement. Paragraph 3(a) provides, "In the event that all monies owed are not paid-in-full through the application of commissions, Newton retains all rights with regard to said sums."

The approach advanced in this special concurrence has been adopted in Iowa. The controlling case is *West v. Jayne*, 484 N.W.2d 186 (1992), which involved a dispute between an attorney and his associate. In that case, the attorney agreed to pay the associate a weekly salary. *See West*, 484 N.W.2d at 188. The attorney and associate also agreed to a certain fee-sharing arrangement dependent on who obtained the work and who performed the work. *See id.* After several years in this arrangement, the attorney ceased paying the associate the weekly salary. *See id.* The associate left the firm, took numerous clients and client files (with client consent), and earned substantial fees on the retained cases. *See id.* The attorney sued the associate for his contracted-for

share of the fees earned on the cases. *See id.* As in this case, the associate defended on the ground that the attorney's failure to pay the weekly salary was a material breach excusing any return performance. *See id.* at 189. The court rejected the argument, explaining the duties were independent of each other: "The fact that a certain performance is required on the part of one of the contracting parties does not necessarily render it a condition precedent to the enforcement of any performance on the part of the other party to the agreement." *Id.* The court further stated, "to predicate the discharge of one of the contracting parties upon breach of condition by the other, the party claiming discharge must show the conditions breached constituted the entire agreed exchange by the other party, or was expressly recognized in the bargain as a condition for the other's performance." *Id.* The court concluded the provision breached did not go to the whole of the contract and was not a condition for the other's performance; therefore the breach did not discharge the associate's obligation. *See id.* In other words, the breach was of an independent promise not material to the non-breaching party's obligation to perform. *See* Williston § 44:6, at 100 ("It has been said that a dependent promise goes to the entire consideration of a contract and that the parties would not have entered into the contract without it."); *K & G Constr. Co.*, 164 A.2d at 455 (stating "there are three classes of independent promises left: (1) those in which the acts to be performed by the respective parties are, by the terms of the contract, to be performed at fixed times or on the happening of certain events which do not bear any relation to one another; (2) those in which the covenant in question is independent because it does not form

the entire consideration for the covenants on the part of the adversary party, and ordinarily forms but a minor part of such consideration; and (3) those in which the contract shows that the parties intended performance of their respective promises without regard to performance on the part of the adversary, thus relying upon the promises and not the performances").

Accordingly, for the foregoing reasons, I concur in the result.